[Civ. No. 14713. First Dist., Div. One. Mar. 7, 1951.]

AMANDA MATILDA McDONALD, as Administratrix, etc., et al., Respondents, v. GEORGE HEWLETT, Appellant.

George K. Ford for Appellant.

Louis Ferrari and James F. Brennan for Respondents.

PETERS, P. J.—Amanda McDonald, as the administratrix of the estates of Agnes, August, Fred and George Kromrey, brought this action against George Hewlett, an attorney at law, to recover some $50,000 of money and personal property alleged to belong to the Kromrey estates, possession of which, it is alleged, was secured by Hewlett from George Kromrey by fraud and deceit and in violation of the confidential rela-

tionship existing between the two. Hewlett's basic defense to the action was that the money and property had been received from George Kromrey as a gift. He also cross-complained and counterclaimed, but offered no evidence to support these pleadings and makes no argument in his briefs on the issues thus created.

The trial court found that the relationship of attorney and client existed between Hewlett and George Kromrey when the alleged gift was made; that Hewlett secured possession of some $40,060 belonging to Kromrey fraudulently, unlawfully and in violation of the confidential relationship. The court concluded that there was no valid gift, and entered its judgment accordingly. Hewlett appeals.

The evidence undoubtedly supports the findings. This is the second appeal to reach this court in which the transactions here involved have come under court scrutiny. In addition to the alleged gifts here involved, Hewlett succeeded in getting himself appointed coadministrator of the estate of Fred Kromrey, and administrator of the estates of August and Agnes Kromrey. Because of the more than questionable manner in which these documents were secured, and because of the actions of Hewlett in connection with the very transactions here involved, Hewlett was removed as administrator of these estates. This court affirmed the orders of removal. (*Estate of Kromrey,* 98 Cal.App.2d 639 [220 P.2d 805].) Reference is made to that case for a statement of facts supplementary to those here set forth.

Hewlett is an attorney, having practiced since 1904. Since 1944 he has been attorney for George Kromrey, and handled several matters for him. In 1948 Kromrey was a man of about 54 years of age who had not worked for about five years, having been ill for about that time. After his death, which occurred on February 14, 1949, it was discovered that he had been suffering for over five years from a large tumor of the pituitary gland which extended up into his brain, and which the medical evidence shows could have affected his vision and his brain. George Kromrey was the administrator of the estates of August and Agnes Kromrey, his mother and father, and of Fred Kromrey, his brother. Fred died in 1943, and August and Agnes died in 1947.

Amanda McDonald has lived in the lower flat of the Kromrey house since 1940, the Kromreys occupying the upper flat. After the death of August and Agnes, George continued to live in the upper flat, but took all of his meals with Mrs.

McDonald. She generally looked out for George and nursed him through his frequent sick spells.

On October 28, 1948, George had a bad sick spell and his doctor, after finding that George was very sluggish and unable to answer questions, sent him to the psychiatric department of the San Francisco Hospital. Mrs. McDonald had accompanied Kromrey to the hospital and testified that he was then in a dazed stupor. She discovered that Hewlett was Kromrey's attorney, and telephoned to him and told him of his client's condition. Hewlett requested Mrs. McDonald to come to his office the next morning. This she did. When she informed Hewlett that Kromrey's father, mother and brother were dead, Hewlett dictated, in the presence of Mrs. McDonald, four documents, one of which nominated Hewlett as coadministrator of the estate of Fred, two nominated Hewlett as administrator of the estates of August and Agnes, and the fourth appointed Hewlett general agent for George Kromrey, with control over his property. After the four documents were transcribed, Hewlett, his son Palmer, and Mrs. McDonald proceeded to the hospital. Mrs. McDonald testified that Kromrey was "laying there in a very dull stupor . . . You wouldn't say unconscious, but just a stupor. . . . He never spoke." Hewlett testified that Kromrey requested that Hewlett take care of his business affairs, but Mrs. McDonald testified that Kromrey never spoke a word; that "Mr. Kromrey could not talk"; that she tried to hold Kromrey up to sign the documents, but he was just a dead weight and she could not manage it, so Palmer Hewlett held Kromrey up; George Hewlett then put a pen in Kromrey's hand and guided the hand and spelled out the names while Kromrey signed the four documents. Palmer notarized them. Admittedly, no explanation of the nature of these documents was given by Hewlett to Kromrey. Mrs. McDonald testified that as they were leaving the hospital Hewlett tried to make a "deal" with her, by suggesting that when Kromrey died she put in a claim for $3,000 in the estate for services rendered. Mrs. McDonald replied that she was not interested in any "deal," that "All I care about is Mr. Kromrey's well-being."

Hewlett came into possession of the $40,060 here involved under the following circumstances: The four documents were signed on October 29, 1948. The next day Palmer Hewlett and Hewlett's secretary called at the Kromrey house and demanded that Mrs. McDonald deliver to them Kromrey's property. They visited Kromrey's flat and Palmer and the secre-

tary removed a drawer full of miscellaneous personal property and documents, including an envelope containing currency which the trial court found, and Hewlett admitted, contained $8,600. Palmer refused to count the money in the presence of Mrs. McDonald and refused to give her a receipt, stating that it was not necessary. Defendant Hewlett, while his son and secretary were in the house, was waiting across the street. Hewlett was somewhat evasive as to what had happened to this money, but he finally admitted that on November 1, 1948, he put it in a safe deposit box at the Haight-Ashbury branch of the American Trust Company, the box being taken in the name of Hewlett and his son Palmer.

The second sum of $31,460 was received by Hewlett from Mrs. McDonald on the night of November 2, 1948. This money had been given to Mrs. McDonald by Kromrey to keep for him. Mrs. McDonald, while Kromrey was in the hospital, asked him what he wanted done with the money, and he gave her written instructions that the money should be deposited in the bank. Hewlett discovered that she had the money and demanded possession of it, saying that it belonged to the three estates, and threatening that unless it was paid over to him the government would assess penalties and throw Kromrey into jail. Mrs. McDonald showed Hewlett Kromrey's instructions, but Hewlett replied that he was administrator of the estates and agent for Kromrey, and was not interested in Kromrey's wishes. Mrs. McDonald insisted that the money be counted and a receipt given to her. When this was done she turned the $31,460 over to Hewlett. Hewlett, after some evasion, admitted that that night he tried to put this money in a safe deposit box at a day and night bank, but that department of the bank was not open. The next day Palmer and Hewlett rented a new safe deposit box at the same bank in which the $8,600 had been placed. Only Hewlett and Palmer had access to this box. Hewlett testified that he told the bank manager that the money belonged to Kromrey, and this was corroborated by the bank official, but that official also testified that he suggested that the money be put into a trustee account. This, Hewltt refused to do.

Hewlett claims that both of these deposits were given to him as a gift by Kromrey on November 7th and 8th, 1948. Another son of Hewlett's—George, Jr., by name—had visited Kromrey on November 6, 1948. He testified that at that time Kromrey praised Hewlett and told George, Jr., that he wanted to make a gift of all the money to Hewlett. George, Jr., con-

veyed this message to his father, and on November 7, 1948, George, Jr., and Hewlett visited Kromrey at the hospital. No one else was present. Hewlett testified that he asked Kromrey if he wanted to make a gift of the money to him; that Kromrey stated that he did; that he fortuitously had the $8,600 with him, and had a receipt for the $31,460; that he handed the envelope and the receipt to Kromrey who handed them back to him; that he thanked Kromrey and suggested that a paper should be drawn up recognizing the gift. No doctor, nurse or other disinterested person was called in to witness the alleged gift. On November 8, 1948, Hewlett, this time accompanied by Palmer and his secretary, again visited Kromrey. Hewlett presented to Kromrey, and Kromrey signed, the alleged gift document. Palmer and the secretary signed as witnesses. The affidavits of the witnesses were later notarized by a notary not then present. The document reads as follows:

"San Francisco, California

November 8, 1948

"I have delivered, and now confirm delivery, to George Hewlett, my good friend, all of my money and personal property or all to which I am entitled as heir, and I give him the same absolutely, and he has accepted the same.

George A. Kromrey—

Witnesses: Mae Montgomery
           Palmer B. Hewlett"

On December 2, 1948, Hewlett received from Kromrey a formal notification that the power of attorney theretofore executed by Kromrey was rescinded. Hewlett also received a letter dated December 15, 1948, from an attorney who had been retained by Kromrey referring to the fact that the attorney had tried unsuccessfully to communicate with Hewlett, referring to the four documents executed on October 29, 1948, stating that the power of attorney had already been revoked, cancelling the other documents and demanding a return of all moneys and personal property in Hewlett's possession. Hewlett testified that he did not return the money because "I had a gift and I didn't care how many demands they made on me." It is quite significant, however, that until after Kromrey died on February 14, 1949, Hewlett did not tell Kromrey or his attorneys that he made any claim to the property or money in his possession. Although Mrs. McDon-

ald telephoned to Hewlett and tried to get him to visit Kromrey, Hewlett never appeared.

Hewlett testified that Kromrey read and signed the document dated November 8, 1948, without the aid of glasses. Mrs. McDonald testified that, although Kromrey did not wear glasses, he used a magnifying glass to read and could not read without such assistance. There was medical evidence that the tumor that Kromrey had was close to the optic nerve, and that one of the "characteristic symptoms of a tumor in this location" would be "likely" to cause "defective vision," would be likely to cause "forgetfulness" and a "confused and disoriented state of mind," and accounted for the "blackouts" from which Kromrey suffered. A doctor who had attended Kromrey at the hospital testified for Hewlett that Kromrey's vision was not markedly impaired, but he could not testify whether Kromrey could or could not read without assistance. This same doctor had written in the hospital chart on October 28, 1948, that Kromrey had "Marked physical and mental lethargy" and he had also written therein that when he asked Kromrey his source of income the patient replied that "he gets money that just floats around."

Hewlett also produced the testimony of two fellow students of his son George, Jr., who had visited Kromrey at George, Jr.'s request, to the effect that they saw Kromrey read without glasses. A fellow patient of Kromrey testified to the same effect. The secretary of Hewlett likewise so testified, and a son-in-law of Hewlett stated that on November 15, 1948, Kromrey told him that he had made a gift to Hewlett.

A mere recital of this evidence demonstrates that the finding that no valid gift was made, because of fraud and undue influence exerted by Hewlett in violation of the confidential relationship is amply supported by the evidence. The purported gift was unfair and unconscionable. If valid, Kromrey would practically have made himself a pauper, and this at a time when he was unable to work and needed medical and hospital care. The surrounding circumstances render suspect Hewlett's entire conduct in the matter. There can be no doubt that under section 2235 of the Civil Code there is a rebuttable presumption of undue influence and insufficient consideration in transactions involving a trustee and beneficiary, and that this section includes the relationship of attorney and client. (*Plxweve Aircraft Co.* v. *Greenwood,* 61 Cal.App.2d 21 [141 P.2d 933].) As was said in that case (p. 24): "This does not mean that a trustee may not

deal with his beneficiary. But if he does deal with him in such a manner as to obtain an advantage, the trustee has the burden of showing by evidence that the transaction was fair. [Citing cases.]'' (See, also, *Moore* v. *Hoar,* 27 Cal.App.2d 269, 288 [81 P.2d 226].)

█ It is up to the donee to show that the transaction was fair and free from undue influence. (*Bohn* v. *Gruver,* 111 Cal.App. 386, 394 [295 P. 891].) As was said in that case (p. 393): ''The fact that the testator was old and feeble was in view of defendant's claim a suspicious circumstance [citing a case]; and where the alleged donor is lacking in such mental vigor as to enable him to protect himself against imposition, although his mental weakness is not such as to justify his being regarded as totally incapacitated, an alleged gift *inter vivos* will be presumed to be fraudulent or secured by undue influence. [Citing cases.] It is also the rule that long delay in disclosing an alleged transfer, or the fact that there was no disclosure until after the death of the donor, are circumstances which render the testimony of the claimant subject to suspicion. [Citing cases.]''

Another good case discussing the problem is *Estate of Phillipi,* 76 Cal.App.2d 100, 102 [172 P.2d 377], where the court stated: ''That Mr. Wilson was the attorney of the testator and that a confidential relationship existed between them is not questioned. Where such a situation exists the rebuttable presumption of fraud or undue influence arises where the attorney profits from his dealings with his client. That presumption can only be overcome by clear and satisfactory evidence that the transaction between the attorney and his client was fair and equitable and that the attorney had taken no advantage of the relationship and that the client was fully informed as to all matters relative to the transaction.'' (See, also, *Estate of Witt,* 198 Cal. 407 [245 P. 197].)

█ The most that can be said in support of the appeal is that Hewlett offered evidence, mainly of himself, his relatives or his secretary, that would have supported a finding that the presumptions involved had been rebutted. But the trial court did not believe these witnesses. In view of the obvious interest of most of these witnesses the trial court was not bound by their testimony. The burden was on Hewlett to rebut the presumptions. This he failed to do. Moreover, the mental and physical condition of Kromrey, the nature of the

gift, its palpable unfairness to Kromrey, and the other surrounding circumstances all support, affirmatively, the findings of the trial court.

Hewlett makes several technical contentions in support of his appeal. ■ He first argues that the mere introduction of the gift writing dispelled the effect of the presumption of undue influence. To state the contention is to refute it. The contention assumes the validity of the gift instrument, the very point in issue. ■ Of course, a disputable presumption may be refuted by evidence of the facts, but it is normally for the trial court to determine whether the proffered testimony outweighs the presumption. (*Steward* v. *Paige*, 90 Cal. App.2d 820, 824 [203 P.2d 858]; *Khoury* v. *Barham*, 85 Cal. App.2d 202, 212 [192 P.2d 823].) ■ Obviously, where the trial court reasonably does not believe the rebutting testimony the presumption is unimpaired.

■ Hewlett next argues that the gift instrument (which was introduced into evidence by respondent) established a prima facie case of legal delivery, citing *Dinneen* v. *Younger*, 57 Cal.App.2d 200 [134 P.2d 323]. That case undoubtedly stated this well settled rule, but it also stated the equally well settled limitation on the rule, namely, that "The presumption of legal delivery, thus created, is not conclusive" (p. 204) and does not establish the requisite element of intent. All of the cases cited by Hewlett for the proposition that the introduction of the gift document established a prima facie case of valid delivery, also hold that such prima facie case can be contradicted and overcome by other evidence. (*People* v. *Mahoney*, 13 Cal.2d 729 [91 P.2d 1029]; *Berry* v. *Chaplin*, 74 Cal.App.2d 652 [169 P.2d 442].) That is this case.

■ The last point made by Hewlett that warrants discussion is that he pleaded *in haec verba* the gift document in his answer and respondent failed to file the affidavit referred to in section 448 of the Code of Civil Procedure. This, says appellant, results in an admission of the genuineness and due execution of the document, so that the finding against the validity of the gift cannot stand against this admission. The point lacks merit.

The trial court found that it was not true that Kromrey on the dates involved "made or confirmed a gift of the money, or any part thereof . . . to George Hewlett; that no gift was in fact ever made by said George August Kromrey to said George Hewlett of said sum of $40,060.00, or any part thereof."

It is true that failure to file the affidavit required by the code section admits "the genuineness and due execution" of the instrument—that is, that it was signed and is not spurious. But it does not establish incontrovertibly a valid delivery. In *Miller* v. *McLaglen,* 82 Cal.App.2d 219, 224 [186 P.2d 48], the court, citing many cases, stated the proper rule as follows: "Failure to file the affidavit merely means that a plaintiff admits the due execution and genuineness of the instruments. He admits that the instruments were signed and delivered and that they are not spurious, nothing more. Failure to file an affidavit does not preclude a plaintiff from making any defense whatever to the affirmative allegations of the answer. He could, by evidence, controvert the instruments upon any and all grounds except that he could not controvert their due execution or their genuineness. He could controvert the instruments by evidence of fraud, mistake, undue influence, mental incapacity, . . ."

The other points urged by appellant do not warrant discussion.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied April 6, 1951, and appellant's petition for a hearing by the Supreme Court was denied May 3, 1951.