[Crim. No. 2721. First Dist., Div. One. Dec. 27, 1951.]

THE PEOPLE, Respondent, v. GEORGE HEWLETT, Appellant.

George Hewlett, in pro. per., for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn and Winslow Christian, Deputy Attorneys General, for Respondent.

PETERS, P. J.—This is an appeal by George Hewlett from a judgment of conviction on two counts of grand theft, and from the order denying his motion for a new trial.

The transactions forming the basis of the criminal charges here involved have twice been before this court in civil actions. In *Estate of Kromrey,* 98 Cal.App.2d 639 [220 P.2d 805], orders removing Hewlett as administrator of the estates of Fred, August and Agnes Kromrey were affirmed on the grounds that Hewlett had improperly gained control of approximately $45,000 belonging to the three estates and to George Kromrey, and that Hewlett was not a fit or proper person to administer the estates. In *McDonald* v. *Hewlett,* 102 Cal.App.2d 680 [228 P.2d 83], the administratrix of the four Kromrey estates (George Kromrey having died) brought an action to recover from Hewlett moneys alleged to belong to those estates and alleged to have been gained by Hewlett through fraud. The trial court held that the moneys had been secured by Hewlett by means of fraud and undue influence, and granted the ad-

ministratrix a judgment against Hewlett for $40,060. This was affirmed on appeal. In both of these cases the Supreme Court, without a dissenting vote, denied hearings.

Before either of the civil cases had been finally decided Hewlett was indicted, it being charged that, on or about October 30, 1948, he stole $15,000 from George Kromrey, and that on or about November 2, 1948, he unlawfully took $31,460 belonging to George Kromrey. The jury found Hewlett guilty on both counts. After denial of motions for probation and for a new trial Hewlett was sentenced to imprisonment in the state prison, with the sentences to run concurrently.

On this appeal his main contentions are: (1) That the evidence is insufficient to support the verdict on either count for the reason that there is no evidence of felonious intent; (2) that there was prejudicial error in the giving of certain instructions; (3) that the trial court erroneously denied his motion for advised verdicts; (4) that the evidence at most shows but one offense; and (5) that the trial court committed error in admitting certain evidence.

### Sufficiency of the Evidence

The record here is over 1,100 pages in length. The facts on this criminal trial are, with certain minor differences, substantially similar to those produced in the two civil cases. As produced on the present trial, the facts most favorable to the prosecution may be summarized as follows:

Hewlett is an attorney and has been practicing law since 1904, most of the time in San Francisco. Sometime between 1940 and 1942 he first met George Kromrey, and the two became friends. In 1943 Hewlett became attorney for George Kromrey, who was then administrator of his brother Fred's estate. This relationship, both personal and as attorney and client, continued down through October and November of 1948, the critical period here involved.

George Kromrey, in 1948, was 54 years of age. For many years he lived in his parents' house in San Francisco with his parents and with his brother, Fred. A family named McDonald occupied the lower flat of this house. In 1943 Fred Kromrey died and the parents nominated George Kromrey as administrator of his estate. Hewlett became attorney for George Kromrey as administrator. This estate was still open in 1948 during the periods here involved. In 1947 the parents both died, leaving George Kromrey as the sole survivor of the

family and sole heir to all three estates of which George Krom-
rey was appointed administrator.

Prior to the death of his mother in June of 1947, Kromrey
had been neat, dressed well and was alert. He had had spells
of illness in 1944, 1945 and 1946, but these were not of long
duration. During the last few weeks of his mother's illness
he appeared dazed and spoke very slowly. After his mother's
death there were marked changes in his behavior and health.
The sick spells, described as "blackouts," occurred quite fre-
quently. He shaved infrequently and allowed his hair to
grow long. His clothes and rooms became untidy.

After his mother's death Kromrey took most of his meals
with Mrs. McDonald, who lived in the lower flat, and fre-
quently visited the McDonald family. Mrs. McDonald had
helped to nurse the mother, and also looked after Kromrey.
In April, 1948, Kromrey had a very bad sick spell. He locked
himself in his room and refused to come out for two or three
days. During this period he cried, moaned and screamed.
When he finally opened his door he was so weak he had to be
led down the stairs and fed. His room was filthy. After such
a spell Kromrey could remember nothing of what had occurred
during the spell. He was very close with his money, and in-
clined to be miserly.

After April of 1948 Kromrey's health continued to deteri-
orate. The sick spells came closer and closer together. Finally,
on October 28, 1948, he had a very bad spell, and collapsed.
Mrs. McDonald called a doctor. He testified that he found
Kromrey apathetic and disheveled and that he would not re-
spond to questioning. This doctor sent Kromrey to the San
Francisco Hospital for observation, in an ambulance, accom-
panied by Mrs. McDonald. She testified that Kromrey was
then in a dazed condition.

Up until this time, Mrs. McDonald had never met or heard
of Hewlett. Apparently Hewlett had seen Kromrey but very
little in 1947 and 1948. While the hospital attendants were
questioning Kromrey he mentioned that his attorney was
named "Hewitt." Upon returning to her home Mrs. McDon-
ald was unable to find the name "Hewitt" in the telephone
directory, but did discover, in Kromrey's flat, a business
envelope of George Hewlett. After some difficulty, she got
in touch with Hewlett and told him that Kromrey was ill.
Hewlett requested Mrs. McDonald to come to his office the next
morning, and stated that his secretary, Mrs. Montgomery,
would accompany her.

The next morning, accompanied by Mrs. Montgomery, who was a public stenographer and part-time secretary of Hewlett, Mrs. McDonald went to Hewlett's office. She told him that the doctor thought Kromrey was a mental case and had sent him to the psychiatric ward of the hospital. Hewlett, according to Mrs. McDonald, made various disparaging remarks about Kromrey, stating that Kromrey had sponged off his parents all his life, never earned a cent and was ''just a common thief.'' Hewlett seemed surprised to learn that the parents of George Kromrey were dead. When reminded by his secretary that George Kromrey was now the heir of all of the estates, Hewlett told Mrs. McDonald that he or his son should be appointed guardian for George Kromrey. Mrs. McDonald expressed some opposition to this procedure. Hewlett, in the presence of Mrs. McDonald, then telephoned another attorney and talked the problem over with him. In this conversation Hewlett several times repeated the word ''agent.'' This testimony was contradicted by Hewlett and by Mrs. Montgomery, but this conflict was, of course, for the jury.

After talking with the other lawyer, Hewlett dictated to Mrs. Montgomery, in the presence of Mrs. McDonald, four documents. These four documents were an appointment of Hewlett as general agent for Kromrey, and nominations by Kromrey of Hewlett as administrator in the estates of the parents and brother of George Kromrey.

After these documents had been typed, Hewlett, his son Palmer, and Mrs. McDonald drove out to the hospital to see Kromrey. It should be here mentioned that after Kromrey had entered the hospital he was examined over a period of time, by a group of doctors. They ultimately discovered that he had a tumor of the pituitary gland which had existed for some time and which had grown to such an extent that it pressed on the brain and on the optic nerve, causing a defect of vision. The autopsy, performed in February, 1949, confirmed this diagnosis. One of the doctors who thoroughly examined Kromrey shortly after his entry to the hospital, testified that Kromrey was uncooperative, unable to answer simple questions, was apathetic, his memory was bad, and he was disoriented.

When Hewlett, his son Palmer and Mrs. McDonald arrived at the hospital Hewlett, according to Mrs. McDonald, said to Kromrey: ''You know me, I am George Hewlett, and this is my son, Palmer. We have got to take over all your affairs and you won't have a worry in the world. All you have to do is

sign these papers here.'' Kromrey did not answer. Mrs. McDonald also testified that Kromrey was so ill that he had to be helped into a sitting position. Hewlett, according to Mrs. McDonald, who was present at all times here relevant except when she left the room for a moment to get something for Kromrey to write upon, at no time, while she was present, explained to Kromrey the nature of the papers or their effect. Hewlett put the pen in Kromrey's hand and spelled out Kromrey's name while Kromrey signed the four documents. Hewlett did explain to Mrs. McDonald that one of the documents appointed him Kromrey's general agent. This testimony is contradicted by the evidence of Hewlett and his son, but this conflict was for the jury. This all took place on October 29, 1948.

On Saturday, October 30, 1948, Palmer Hewlett and Mrs. Montgomery called on Mrs. McDonald and requested permission to search Kromrey's flat. The appellant did not come into the premises at this time, but was waiting outside. Mrs. McDonald accompanied Palmer and Mrs. Montgomery to the upstairs flat and watched while they searched. She saw Palmer remove a drawer containing personal papers of Kromrey. Mrs. McDonald, upon request, showed Palmer and Mrs. Montgomery where Kromrey kept his money, and several envelopes containing $15,000 in cash were found there. The money was not then counted, but was kept by Palmer and Mrs. Montgomery. No receipt was given Mrs. McDonald for the money or other articles. Palmer and Mrs. Montgomery left the premises with the personal property and the money, and drove away, accompanied by Hewlett.

Several days before going to the hospital Kromrey had turned over to Mrs. McDonald for safekeeping over $31,000 which he asked her to keep in her apartment. After Palmer Hewlett and Mrs. Montgomery had taken the personal belongings of Kromrey and the $15,000, Mrs. McDonald visited Kromrey and told him about the $15,000, and asked what she should do about the other money. Kromrey told her to keep it until he got home. On November 2, 1948, Mrs. McDonald again told Kromrey that Hewlett was demanding the money, and Kromrey told her to deposit the money in the bank and gave her written authority to do so.

In some fashion Hewlett learned that Kromrey had more than the $15,000 already secured by him. He testified that Kromrey told him of the larger sum. At any rate, he telephoned to Mrs. McDonald several times and asked her about

the other money. She denied any knowledge of any further money, but called her attorney, James Brennan, and asked him what to do. Brennan tried to reach Hewlett, and finally did so on November 2, 1948. Hewlett told Brennan that he was the administrator of the estates of the three deceased Kromreys. This was false, inasmuch as the nominations and petitions were not filed until November 3d and Hewlett was not appointed until November 15th. Brennan, when informed by Hewlett that Hewlett was administrator of the three estates, told Mrs. McDonald to turn the money over to Hewlett. This was the very day she had received the written authority from Kromrey to deposit the money in the bank. Palmer Hewlett and Mrs. Montgomery, this same night, called upon Mrs. McDonald and demanded the money. She refused to give it to them and they left, returning in a few minutes accompanied by appellant. Mrs. McDonald showed Hewlett the authorization she had from Kromrey. Hewlett stated that he was not interested in anything Kromrey had "to say about that money" and that he was "in charge." Hewlett also stated that Kromrey might go to jail because of the way he had handled this money, and that he had told Kromrey that. Finally, Mrs. McDonald produced the money, it was counted, given to Hewlett, and he gave her a receipt for $31,460.

Hewlett deposited the $15,000 in a safe deposit box, which box was in his name and that of his son, Palmer. He rented another safe deposit box in the same bank in his name and that of Palmer, and deposited therein the $31,460 even though the bank employee suggested that the money be deposited in a trust account. Hewlett testified that he marked the envelopes containing the money as the property of Kromrey, and that Kromrey had told him to place the money in a safe deposit box.

Hewlett testified that, on November 4th, Kromrey asked him to prepare a will. On November 5th Hewlett brought to the hospital two wills, one naming Hewlett as executor and providing for a cash bequest to Kromrey's aunt in the sum of blank dollars, and the other simply appointing Hewlett as executor and containing no bequests of any kind. This last will was signed by Kromrey on November 5th, Mrs. Montgomery being one of the two subscribing witnesses.

Hewlett testified that, on November 7th, Kromrey told him that he wanted to make a gift to Hewlett of all of the money and personal property taken from the house, and that he wanted to see the money again. Hewlett also testified that on that same day he brought to the hospital the envelopes con-

taining the money first taken from the house, and some stock, but only brought a receipt for the $31,460, and handed them to Kromrey. According to Hewlett, Kromrey then handed the money, receipt and stock over to Hewlett stating that he wanted to give them to Hewlett, and requested Hewlett to prepare a writing evidencing the gift. Admittedly, no one else except Hewlett and Kromrey was present when these transactions are alleged to have occurred. A son of Hewlett, named George, testified that, before the 7th of November, Kromrey had told him that he wanted to make these gifts to Hewlett.

On November 8th Hewlett returned to the hospital accompanied by Palmer and Mrs. Montgomery. Hewlett had prepared a gift instrument. This document, dated November 8th, reads as follows:

"I have delivered, and now confirm delivery, to George Hewlett, my good friend, all of my money and personal property, or all to which I am entitled as heir, and I give him the same absolutely, and he has accepted the same."

The document is signed by George A. Kromrey, and Mrs. Montgomery and Palmer signed as witnesses. They all testified that the document was executed voluntarily.

After the document was signed, Hewlett, Palmer and Mrs. Montgomery proceeded to the city hall where they had it notarized (although Palmer was a notary), and then had it photostated. Hewlett testified that on November 9th he showed the photostat to Kromrey and that the latter stated that it was just what he wanted.

There was considerable controversy over whether Kromrey could read without the aid of a magnifying glass. Hewlett testified that Kromrey read all of the documents presented to him without artificial aid of any kind. Several other witnesses testified that Kromrey could and did read without artificial help. Mrs. McDonald testified that Kromrey could not read without using a magnifying glass. The medical testimony, including the autopsy, tended to show that Kromrey's vision was impaired.

Sometime about the middle of November Kromrey expressed to Mrs. McDonald the desire to go home. Mrs. McDonald conveyed this desire to Hewlett who objected, and who told Mrs. McDonald to quit "interfering." About the 28th of November Kromrey was transferred to the French Hospital. How this was arranged is not clear. Kromrey, at any rate, was not satisfied and wanted to go home. On December 1st Kromrey

signed himself out of the hospital and, accompanied by Mrs. McDonald and a friend, he went home. As soon as he arrived he expressed a desire to see Hewlett, and Mrs. McDonald telephoned to Hewlett's office and told Mrs. Montgomery that Kromrey wanted to see Hewlett. Mrs. McDonald further testified that she never heard from Hewlett and that he never did telephone or call. Kromrey, except for the home in which he lived, and the property in the possession of Hewlett, was penniless, and the McDonalds took care of him.

On December 2d Hewlett, after talking to a superior court judge, complained to the district attorney that Kromrey had been kidnapped from the French Hospital. An assistant district attorney, accompanied by Palmer Hewlett, called at Kromrey's home. Kromrey informed the deputy that he had not been kidnapped, and that he had come home of his own accord.

On this same day, Brennan, upon instructions from Kromrey, prepared and Kromrey signed, a revocation of Hewlett's power of attorney, and a copy was mailed to Hewlett. Kromrey, according to Mrs. McDonald, told her that he did not remember signing the document appointing Hewlett his general agent.

On December 6th or 7th, Perlis, an attorney associated with Brennan, called upon Kromrey. He testified that Kromrey then appeared mentally alert. When Perlis told Kromrey that he had signed nominations of Hewlett as administrator of the various Kromrey estates, Kromrey stated that he did not remember anything about signing such nominations. On December 14th or 15th Kromrey, in writing, authorized Brennan and Perlis to act as his attorneys in all business affairs.

On December 15th Perlis wrote to Hewlett informing him of this appointment. He reminded Hewlett that he and Brennan had tried unsuccessfully to get in touch with Hewlett by telephone, that the power of attorney had been revoked, and made a formal demand upon Hewlett to return all of the property taken by him from the home of Kromrey. A request was made that Hewlett get in touch with Perlis.

In spite of these many requests, Hewlett failed to get in touch with Kromrey or his attorneys—in fact, he never saw Kromrey again.

About December 17th Kromrey told Perlis that he had never made a will and desired to do so, and a will was executed leaving the property to Mrs. McDonald.

About December 20th Brennan, after great difficulties, finally reached Hewlett by telephone. Hewlett told Brennan that there was nothing to worry about as all the money was safely in the bank, and Hewlett promised to come to see Kromrey in the immediate future and straighten matters out. He never performed this promise, nor did he then or any other time prior to the death of Kromrey, ever claim that a gift of the moneys had been made.

On January 11, 1949, Perlis filed a petition to remove Hewlett as administrator of the three Kromrey estates. Strenuous efforts were made to serve Hewlett, but he could not be found. Between eighty to one hundred hours were spent by a hired agency trying to serve Hewlett. He was finally served and brought into court on February 15, 1949. George Kromrey had died the night before. At this hearing on the 15th of February, Hewlett for the first time, publicly, claimed that the money belonged to him by way of gift.

Appellant was charged with grand theft. This offense, since the amendments to the Penal Code of 1927, is an all inclusive offense, and includes the former crimes of larceny, embezzlement and obtaining money by false pretenses. But even since these amendments the essential elements of these offenses have in no way been changed. To prove grand theft it is necessary to prove the basic elements of one of these three offenses. (*People* v. *Cravens*, 79 Cal.App.2d 658 [180 P.2d 453].) The trial court limited its instructions to embezzlement. This crime is defined in section 503 of the Penal Code as "the fraudulent appropriation of property by a person to whom it has been entrusted." The elements of an embezzlement are:

(1) The accused must be the agent or bailee of the prosecuting witness in holding the allegedly embezzled property;

(2) the property must actually belong to the alleged principal;

(3) it must be lawfully in the possession of the accused at the time of the alleged embezzlement;

(4) the accused must have been guilty of the conversion which the statute denounces; and

(5) there must be shown an intent on the part of the accused to deprive the owner of his property unlawfully. (*People* v. *Cannon*, 77 Cal.App.2d 678, 689 [176 P.2d 409].)

The appellant argues that no larceny was involved because he received the moneys as attorney or agent for Kromrey so that no trespass was involved, nor does the evidence show a fraudulent intent when he received the money. He then

argues that no embezzlement was involved because he made no claim to the money until after the alleged gift had been made. In this connection he urges, as he unsuccessfully did on the civil appeals, that the gift instrument was prima facie evidence that title to the moneys had passed to him, and that the validity of that instrument was not destroyed by the evidence. Therefore, so he claims, he could not be guilty of embezzlement because the funds were his property. He argues that it is not enough to vitiate the gift instrument simply to show that it was acquired by undue influence, or that the donor lacked capacity, but that actual fraud and deceit must be shown. No actual fraud or deceit, according to appellant, was here shown to exist. Appellant also argues that since he was held liable for the money in *McDonald* v. *Hewlett*, 102 Cal.App.2d 680 [228 P.2d 83], that case necessarily established that a debtor-creditor relationship existed between him and Kromrey, which necessarily determined that the money belonged to Hewlett. No authorities are or can be cited for these theories. The opinions in the two civil cases discuss most of these contentions and decide them adversely to appellant. What was there said need not be here repeated. Moreover, appellant admits that the money originally belonged to Kromrey. He admits that he got this money and used it for his personal purposes. The basic question was his state of mind when he first got the money and when he converted it to his own use. The evidence amply supports the implied finding of an unlawful intent. The manner and fashion that the agency agreement and nominations were prepared and secured, the securing of the signatures to these documents and to the gift while Kromrey was incompetent, Hewlett's misrepresentations to Brennan about his status as administrator of the estates, all support the implied finding that there were unlawful misappropriations of the money. The evidence also supports the implied finding that the gift was secured by actual fraud. The circumstances under which the gift instrument was secured are sufficient to raise the inference. The fact that the gift, if valid, would render Kromrey, a man who until then had been somewhat miserly with his money, completely destitute of any property except his home at a time when he needed and was receiving medical care, could be considered by the jury on the issue of guilt. The evidence of Hewlett's bad faith in telling Kromrey's attorneys that the money was safely in the bank, that Kromrey had nothing to worry about, and that he, Hewlett, would call upon Krom-

rey in the near future (which he failed to do) to straighten matters out, if believed by the jury, as it apparently was, supports the verdicts. This is equally true of the fact that, so far as the evidence shows, Hewlett never claimed this money as a gift until after Kromrey's death. The jury was also entitled to find that, while Kromrey was alive, Hewlett deliberately evaded service of process in the action brought by Kromrey to recover the moneys, and that such was a most suspicious circumstance. As was said in *People* v. *Parchen*, 37 Cal. App.2d 215, 222 [98 P.2d 1045] : "On an appeal in a criminal case, the court must assume in favor of the verdict the existence of every fact which the jury could reasonably have deduced from the evidence, and then determine whether the guilt of the defendant is deducible therefrom; and where it is claimed that the evidence is insufficient to support the verdict and the evidence is entirely circumstantial, the question for the court to pass upon is whether there were facts before the jury to justify the inference of guilt."

In our case the evidence is ample and sufficient.

### The Instructions

The instructions in this case are lengthy and detailed. Appellant sets forth in his brief some eighteen pages of instructions. He does not, however, complain of all of these instructions, but sets them forth in order to show a claimed overemphasis and bias. We have read the charge. It was full, fair and complete.

The only serious question presented about the instructions centers around a series of instructions informing the jury that a presumption of undue influence arises where a trustee obtains an advantage over his beneficiary. It is claimed that this is a presumption in civil cases only, and is not applicable in criminal cases. It is argued that, since the defense to the charge of embezzlement was that a gift had been made, or at least that defendant in good faith believed that a gift had been made, to instruct that a presumption of undue influence arose was to deprive him of the presumption of innocence.

This presents an interesting question. Before discussing the law, reference should be made to the precise instructions involved. The court properly instructed that the burden of proof was on the prosecution to prove all elements of the charge to a moral certainty and beyond a reasonable doubt and that "otherwise the defendant standing and entitled to stand upon the presumption of innocence must be acquitted."

The court then instructed on the nature of the charged offense and the elements of the crime of embezzlement. Then, quite properly, elaborate instructions were given to the effect that a trustee who fraudulently appropriates trust property or secretes it with fraudulent intent to appropriate it to his own use is guilty of embezzlement. The court then instructed that if the accused owned the property involved or honestly believed he owned it, he could not be guilty of embezzlement. The court then elaborately discussed the defense of the defendant, namely, that a valid gift to him of the moneys had been made. After instructing on the elements of a gift, the court gave the following instructions: "Where the gift is obtained by a person who at the time has voluntarily assumed a relation of personal confidence with the giver, certain special rules of law are applicable. Under such circumstances the donee is deemed a trustee as to the person who reposes such confidence. Also he is deemed a trustee as to all persons over whose affairs he thus acquires influence which was given to such person in the like confidence or over whose affairs he, by such confidence, obtains any control."

After properly instructing on the duties of a trustee, the court instructed: "In all matters connected with the trust a trustee is bound to act in the highest good faith toward his beneficiary and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat or adverse pressure of any kind."

The court then gave this instruction which is one of the basic ones challenged by appellant: "Further, all transactions between a trustee and a beneficiary during the existence of a trust, or while the influence acquired by the trustee remains, by which the trustee obtains any advantage from his beneficiary, are presumed to be entered into by the trustee without sufficient consideration and under undue influence."

The court then instructed that it was a question of fact for the jury to determine whether a gift had been made, and if they so found they should acquit the defendant. The court then instructed as follows: "In making your determination of whether the defendant rightfully appropriated money entrusted to him by George Kromrey by virtue of a gift made to him of the money by George Kromrey, you may also consider the rule of law that a transaction between a trustee and his beneficiary during the existence of the trust or while the influence acquired by the trustee remains, by which the trustee obtains any advantage from his beneficiary, is presumed by

law to have been entered into by the latter without sufficient consideration and under undue influence.''

The court elaborated on this theme at some length. Among other things, it gave the following instruction: ''This means that if you find from the evidence to a moral certainty and beyond a reasonable doubt that at the time of the alleged gift transaction the relation of trustee and beneficiary existed between George Kromrey and the defendant in respect to the money in question, or that the influence acquired by the defendant as such trustee then remained, you may presume that the alleged gift was obtained by the defendant through undue influence of the defendant upon George Kromrey.''

But the court was most careful to limit these instructions relating to the presumption of undue influence. Among others, it gave the following qualifying instruction: ''The presumption of undue influence to which I have referred is not intended to relieve, and it does not relieve, the prosecution of the burden of proving the guilt of the defendant and every element of the offense charged against him to a moral certainty and beyond every reasonable doubt. It is—that is, the presumption is, as I have said, a mere disputable presumption which may be controverted and overcome by other evidence and it is controverted and overcome whenever other evidence in the case, including other presumptions such as the presumption of innocence, creates or leaves in the minds of the jurors a reasonable doubt as to whether the fact was as so presumed.''

A clear instruction was given on the presumption of innocence, and proper instructions given on the burden of proof.

The main argument of appellant is that although the quoted instructions on the presumption of fraud and undue influence arising in transactions between trustee and beneficiary state valid and correct rules of law with respect to civil relationships, they should not be given in criminal cases. The argument is that such a presumption in a criminal case takes from the defendant the benefit of the presumption of innocence.

This question as to whether the disputable presumptions contained in the Civil Code and Code of Civil Procedure, where warranted by the evidence, should be given in criminal cases is one, strangely enough, on which there seems to be very little direct case law.

Appellant cites and relies upon the case of *People* v. *Hatch,* 13 Cal.App. 521 [109 P. 1097]. That case, in some respects, is quite similar to the instant one. There an agent, attorney and

trustee was charged with embezzlement of his client's funds. He was convicted. The trial court gave an instruction not on the presumption of fraud and undue influence, but part of which is almost identical with one of the instructions quoted *supra* referring to the duties existing between trustee and beneficiary. The judgment of conviction was reversed for many reasons, one of which was that *under the state of the evidence there produced* it was prejudicial error to give the instruction. In this connection the court stated (p. 533): ''While the latter part of the instruction was a correct statement of the law governing the relations of an agent, or attorney, and his principal concerning their respective duties and rights in their civil relations, it was misleading and incorrect as a rule for the guidance of a jury in determining whether or not the agent was guilty of embezzlement. Under the condition of the evidence as above indicated, and in the connection in which the latter part of the instruction was given, it was erroneous, and we think clearly prejudicial to the rights of the defendant.''

It is to be noted that the court did not hold that it was error in all criminal cases to give such an instruction, but simply held that under the condition of the evidence in the particular case it was error to so instruct the jury. This is made crystal clear by what occurred on the retrial. On the retrial the defendant was again convicted and the case ultimately got to the Supreme Court—*People* v. *Hatch,* 163 Cal. 368 [125 P. 907]—a case not referred to by either appellant or respondent. On the retrial the district attorney, in his argument to the jury, over objection argued at some length concerning the duties of a trustee to act in the highest good faith towards his beneficiary. It was urged that under the rule above quoted from the appellate court on the first trial this was prejudicial misconduct. The Supreme Court quoted part of the statement appearing in the appellate court opinion and declared that all that the appellate court held was that under the state of the evidence there appearing such an instruction was not proper, but that under the state of the evidence on the second trial it was proper and correct for the district attorney to refer to the applicable rules of law relating to the duties of trustees. The Supreme Court referred particularly to what the evidence showed as to the conduct of defendant after he got the money—circumstances quite similar to those in the instant case. Thus, if anything, the Hatch cases support the rule

that, where the evidence warrants it, it is proper to instruct on the duties of a trustee.

The instructions complained of relating to the rebuttable presumption of undue influence arising in a proper case in transactions between a trustee and beneficiary are correct summaries of the rule set forth in section 2235 of the Civil Code. The question remains whether such instructions are so incompatible with the presumption of innocence that giving them is reversible error in a criminal case.

Although we have been referred to no authorities directly in point, reason tells us that the presumption of innocence is not so strong that it compels the jury to disregard common sense based upon past experience and reasonable probabilities. A presumption is defined as "a deduction which the law expressly directs to be made from particular facts." (Code Civ. Proc., § 1959.) Thus, a presumption is based on a fact or facts and not upon mere surmise or conjecture—and certainly the facts giving rise to the presumption were here shown to exist. Presumptions are legislative determinations of reasonable probabilities. What experience has shown has normally happened in the past, under the same conditions will normally happen again. Simply because a criminal instead of a civil case is involved does not require the jury to disregard, in their reasoning, the reasonable probabilities that the Legislature has determined exist from certain facts.

Of course a presumption of guilt and a presumption of innocence cannot exist at the same time. But a presumption tending to show guilt when connected with other facts, may outweigh in the jury's mind, the presumption of innocence. If properly limited, it seems quite clear that any of the disputable presumptions set forth by law, where warranted by the evidence, may be considered by the jury in weighing the presumption of innocence and in determining whether the prosecution has sustained the burden of showing that the defendant is guilty to a moral certainty and beyond a reasonable doubt. In the last instruction above quoted the trial court carefully and correctly defined the weight to be given to the presumption of undue influence. The trial court told the jury that this presumption did not relieve the prosecution of the burden of proving every element of the offense charged; that it was a mere rebuttable presumption which could be overcome by other evidence and is "overcome whenever other evidence in the case, including other presumptions such as

the presumption of innocence, creates or leaves in the minds of the jurors a reasonable doubt as to whether the fact was as so presumed.''

The attorney general advances an argument on this phase of the case that seems to us sound. He first points out that in several specific instances the Legislature has provided that presumptions adverse to the defendant in a criminal case shall exist. Thus, Penal Code, section 250, presumes malice in a criminal libel prosecution where ''no justifiable motive for making it is shown.'' This presumption applies although it throws on the defendant the burden of proof as to one element of the crime. (*Davis* v. *Hearst*, 160 Cal. 143 [116 P. 530]; *People* v. *Pryal*, 25 Cal.App. 779 [147 P. 114, 115].)

Penal Code, section 270e, provides that proof of nonsupport of a wife or children shall constitute prima facie (or presumptive) evidence that the abandonment was wilful. (See *People* v. *Wallach*, 62 Cal.App. 385 [217 P. 81]; *People* v. *Martin*, 100 Cal.App. 435 [280 P. 151].)

Penal Code, section 496, provides that purchase of goods from a minor under eighteen shall, under some circumstances, constitute presumptive evidence that the goods were stolen. (See *People* v. *Seerman*, 43 Cal.App.2d 506 [111 P.2d 457].) Undoubtedly, there are other instances in the Penal Code of presumptions adverse to the defendant.

Thus, having established that the Legislature can and has, in several specific instances, made presumptions adverse to the defendant applicable in criminal cases, the attorney general argues that the Legislature has made all disputable presumptions where relevant, applicable to criminal cases. This has been accomplished, according to the argument, by section 1102 of the Penal Code which provides that ''the rules of evidence in civil actions are applicable also to criminal actions, except as otherwise provided in this code.'' There is no other provision of the Penal Code making so-called civil presumptions inapplicable in criminal cases.

Of course, a presumption in this state is evidence, and the law relating to presumptions is a ''rule of evidence.''

There are cases that broadly indicate that so-called civil presumptions, where applicable, may properly be used in criminal cases. Thus, in *People* v. *Le Doux*, 155 Cal. 535, 553 [102 P. 517], it is stated: ''As to instructions actually propounded, the court was justified in its refusal to give them, for they go further than is warranted by the law. The instructions declare that the presumption of innocence is the only

presumption allowable in a criminal case, that it is not overcome by any other presumption, but does overcome all other presumptions of whatsoever kind or nature. Such, however, is not the law. All presumptions are evidence. Conclusive presumptions (Code Civ. Proc., secs. 1961, 1962) are not overcome by the presumption of innocence, nor are many disputable presumptions so overcome." (See, also, *People* v. *Agnew,* 16 Cal.2d 655 [107 P.2d 601]; *People* v. *Minter,* 73 Cal.App. 2d Supp. 994 [167 P.2d 11]; *People* v. *Stolzoff,* 71 Cal.App.2d Supp. 849 [162 P.2d 743]; *People* v. *Layman,* 117 Cal.App. 476 [4 P.2d 244].)

Thus on logic, reason and authority it seems clear that any so-called civil presumption may be used in a criminal case where the facts warrant it, and where the application of the presumption does not arbitrarily determine the case or prevent the jury from making an independent investigation of the crucial issues of fact. The presumption of undue influence is rebuttable. As already pointed out, the court clearly and concisely, in other instructions, informed the jury that the effect of the presumption was not to relieve the prosecution of its burden of proof. In our opinion, there was no error in the giving of these instructions.

The arguments in reference to the other instructions need not be specifically noted. Most of the claimed errors are highly technical and all of them are of such a nature that even if erroneous they could not possibly be prejudicial.

### Denial of Motion for an Advised Verdict

Under this separate heading appellant argues once again the sufficiency of the evidence. He claims that at the close of the prosecution's case there was no evidence of an embezzlement or that he had committed the offense charged except for certain claimed extrajudicial statements of defendant. It is true that the elements of a crime cannot be established by the extrajudicial statements of the defendant, and that such statements cannot supply, alone, the *corpus delicti.* (8 Cal.Jur. p. 167, § 248; 8 Cal.Jur. p. 284, § 343; but see *People* v. *Haflinger,* 91 Cal.App. 50, 52 [266 P. 561].) Of course, the motion for an advised verdict or directed verdict of acquittal was properly denied if the evidence was sufficient to sustain a conviction. (*People* v. *Grossman,* 28 Cal.App.2d 193 [82 P.2d 76]; see cases collected 8 Cal.Jur. p. 284, § 343.) The evidence has already been reviewed. Such summary demonstrates to a certainty that, independently of any extrajudicial

statements of defendant, the evidence, at the close of the prosecution's case, was ample to sustain the two charges of embezzlement. For this reason the motion was properly denied.

### One or Two Offenses?

Appellant was charged with and convicted of two separate charges of grand theft, sentences to run concurrently. It is his contention that if he appropriated the funds at all the evidence shows that he did so under one impulse after he had got both sums in his possession. He contends that, although the evidence shows that he received two separate sums of money at different times, the evidence shows at most that he formed the requisite wrongful intent after both sums were in his possession. This being so, there was but one misappropriation, and, therefore, at most, but one offense. It is undoubtedly the law that, where a trustee lawfully receives money, the crime of embezzlement, which involves a misappropriation after receipt of the money, does not depend upon the time of the acquisition of the funds. (*People* v. *Bratton*, 125 Cal.App. 337 [14 P.2d 125].)

The attorney general's reply to this argument is not very satisfactory. He first seems to treat the offenses as two larcenies and not as two embezzlements. This he may not do. The trial court instructed only on embezzlement. While the evidence may warrant the theory that defendant had the requisite unlawful intent at the very time he received each sum of money, and therefore would have warranted instructions on larceny, the jury was not so instructed. The attorney general may not, therefore, sustain the conviction on charges not submitted to the jury.

The only other argument offered by the attorney general on this point is that even though there was but one offense here and not two, since the sentences are concurrent, the only effect would be a reversal as to one count. That is undoubtedly the law. (See *People* v. *Selk*, 46 Cal.App.2d 140 [115 P.2d 607] ; *People* v. *Knowles*, 35 Cal.2d 175 [217 P.2d 1].)

It is probably true that the evidence can be interpreted as showing but one embezzlement. Certainly it would have been a reasonable interpretation of the evidence to have found that after appellant received the $15,000 on October 30, 1948, and the $31,460 on November 2d, he then formed the unlawful intent to misappropriate both sums. Had the jury so found, there would have been but one embezzlement.

But that is not the only reasonable interpretation of the

evidence. The jury's finding that there were two separate embezzlements is supported. When the evidence is read as a whole it is a possible and a reasonable interpretation of that evidence that appellant received the $15,000 as agent of Kromrey and then formed the unlawful intent to misappropriate it, and then received, also as agent, the second sum, and then formed the unlawful intent to misappropriate that sum. Thus, the problem turns upon just when appellant appropriated the money to his own use. This turns upon his state of mind— a question of fact based upon reasonable inferences. If he made two separate misappropriations it would be two offenses, and this would be true even if he had both sums in his possession when he made the first misappropriation. (*People* v. *Stanford*, 16 Cal.2d 247 [105 P.2d 969].) The jury was justified in finding two embezzlements.

### Hearsay Evidence

Appellant objects to the admission into evidence of certain statements made by Kromrey to various witnesses as to his lack of intent to make a gift. It is urged that such statements were hearsay, inadmissible, and prejudicial.

The first instance of the admission of such testimony was when Attorney Brennan was asked if on December 14th he had had a conversation with Kromrey about his having transferred any personal property or cash to Hewlett. After objection on the ground of hearsay, the prosecutor asked that the conversation be admitted solely to show Kromrey's state of mind on December 14th as it reflected his intention in October and November. The trial court, before permitting the question to be answered, gave a complete cautionary instruction, informing the jury that such statements were admitted solely on the question of Kromrey's state of mind. Brennan was then permitted to answer that Kromrey had never told him that he had made any gifts to Hewlett, that Kromrey stated he still owned the money, and that he did not remember signing any papers at the hospital.

Mrs. McDonald also was permitted to testify as to similar statements made by Kromrey. There are other instances of the admission of similar testimony in the record.

In the instructions given to the jury at the conclusion of the trial the court again gave several cautionary instructions. Among other things, after referring to the testimony in reference to the statements claimed to have been made by Kromrey after the date of the gift instrument, the jury was carefully

told that, if they found that such statements were made, they were to consider them only for the limited purpose of shedding light upon the mental condition and intention of Kromrey at the time of the alleged gift transactions. The jury was carefully told that ''you must not consider such declarations of Kromrey, if made, as proof of the truth of the matters narrated in such declarations, but solely for such bearing as the fact of making such statements may have upon a showing of the state of mind or intention of George Kromrey at the time of the alleged gift transaction.''

When mental condition, intent, or state of mind are in issue, declarations of the decedent made subsequently to the transaction are admissible on such issues. (*Hansen* v. *Bear Film Co.,* 28 Cal.2d 154 [168 P.2d 946] ; *Dinneen* v. *Younger,* 57 Cal.App.2d 200 [134 P.2d 323] ; *Horsman* v. *Maden,* 48 Cal. App.2d 635 [120 P.2d 92].)

In the instant case there were in issue, very definitely, Kromrey's mental capacity and intent at the time that the alleged gift was made. The challenged evidence was admitted for the limited purpose of showing such factors, and limiting and cautionary instructions were given to the effect that the evidence should only be considered in relation to such factors. Under such circumstances it was not error to admit the evidence.

After reading this lengthy record we are convinced that the evidence supports the verdicts. We are further convinced that appellant had a fair trial, and that the jury was fully, fairly, and properly instructed.

The judgment and order appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied January 11, 1952, and appellant's petition for a hearing by the Supreme Court was denied January 24, 1952.