[No. A108062. First Dist., Div. Five. Oct. 11, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD LEON BROCK, Defendant and Appellant.

**COUNSEL**

John Halley, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, René A. Chacón and David M. Baskind, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SIMONS, J.**—Between 1997 and 2002, defendant Ronald Leon Brock requested and received more than $600,000 from Norman Roussey to pay for Brock's living expenses. At all relevant times, Roussey was over 65 years old and qualified as an "elder adult" pursuant to Penal Code section 368, subdivision (g). Based on these transactions, defendant was convicted of theft against an elder (Pen. Code, § 368, subd. (d)) (count 1) and grand theft (Pen. Code, § 487, subd. (a)) (count 2). As to each count, the jury found true an enhancement allegation that defendant took property of a value exceeding $150,000 (Pen. Code, § 12022.6, subd. (a)(2)). Defendant challenges these convictions on numerous grounds. In the one challenge we find dispositive, defendant argues the trial court erred by instructing the jury that Roussey's apparent consent to the transactions was ineffective if obtained by the exercise of undue influence. The court adopted the Civil Code definition of undue influence and informed the jury that "undue influence exists where a defendant [takes] an unfair advantage of another's weakness of mind." We agree with defendant that these instructions were flawed and reverse both convictions.

### FACTUAL BACKGROUND

As a child, Roussey suffered from an anxiety disorder that persisted into adulthood. He never held a job for a significant period of time and eventually moved in with his mother, who managed the shopping and finances. When his mother became ill in the early 1990's, Roussey hired an attorney, Hubert Forsyth, to oppose a conservatorship of her. After Roussey's mother died, Forsyth helped him settle her estate, from which Roussey received his mother's house and the money in her bank accounts.

During this period, Roussey met defendant, who worked in Forsyth's office. Defendant had a law degree, but was not a member of the bar. Forsyth stopped representing Roussey in March 1996, and, in October 1996, terminated defendant's job. Defendant, however, continued to spend time with Roussey subsequent to his termination. He served as Roussey's driver, helped him through his anxiety attacks, spent time in Roussey's home, and traveled with Roussey at Roussey's expense. Records showed that between December 1995 and May 2003, Roussey placed over 2,500 telephone calls to defendant. As Roussey said to an investigator from the district attorney's office, "I help [defendant and] he helps me."

While providing this assistance to Roussey, defendant frequently asked him for money, and Roussey wrote defendant checks or deposited money into defendant's account. Defendant often told Roussey not to discuss these payments with anyone. When Roussey refused to write checks, defendant

would write the checks himself, follow Roussey around the house and ask him to sign the checks until he did so.

Defendant had great influence over Roussey. For example, in 1998, Roussey purchased a $100,000 annuity. When defendant found out, he called the bank, identified himself as Roussey's legal advisor, and directed cancellation of the annuity. The bank complied and returned Roussey's money. In January 2002, Roussey purchased another annuity, designating his niece, Karen Roussey Ramirez (niece), as the beneficiary. Defendant convinced Roussey to cancel the annuity. He called the bank and wrote a letter for Roussey to sign in order to effect the cancellation. When defendant brought the letter to the bank, the financial advisor insisted that Roussey be present. Roussey later went to the bank and cancelled the annuity himself.[1] In June 2002, defendant asked Roussey to withdraw money from another annuity. Roussey withdrew $119,558 and divided the money with defendant because defendant was "low on money."

Defendant also failed to follow through on certain commitments made to Roussey. Defendant told Roussey he had prepared Roussey's taxes for several years, but returns were not filed from 1996 through 2002. As a result, the state and federal governments imposed various liens and fines. In June 2000, defendant asked Roussey to take out a mortgage on his house. Roussey did so and gave half of the $350,000 received to defendant. Defendant agreed to make the mortgage payments, but eventually stopped doing so. Roussey later gave defendant $30,000 to invest in real estate. Defendant kept the money and told Roussey he had used it to pay his bills. On at least two occasions, defendant apparently promised to dispose of automobiles owned by Roussey, but he never provided Roussey with any money received in exchange for the vehicles.

In 2002, Roussey told his niece he was worried about all the checks he had written to defendant and was afraid defendant was stealing from him. But Roussey also spoke positively about defendant to his niece. When she visited Roussey, she suspected he was suffering from diabetes and noticed that some of his expensive furniture was missing. These concerns led her to contact Adult Protective Services.

In April 2002, San Mateo Police Officer Carlton Brown left a phone message with Roussey as part of the investigation into the elder abuse complaint by Roussey's niece. A few hours later, defendant returned Brown's call and identified himself as Roussey's friend and advisor. Defendant informed Brown that Roussey suffered from an anxiety disorder and took

---

[1] On direct examination, Roussey testified that defendant contacted the bank and told him to sign the cancellation letter. During cross-examination, however, Roussey indicated that it was his idea to cancel the annuity and defendant helped him accomplish that.

medication for that condition. Defendant said Roussey wrote and signed all of his own checks. Defendant expressed concern that Roussey's brother was trying to take some of Roussey's money. Brown indicated that he wanted to speak directly with Roussey, but defendant rejected this request, saying it would make Roussey too anxious.

When Brown and Diane Wilson, a caseworker for Adult Protective Services, eventually met with Roussey, Wilson noticed that Roussey talked slowly, at times seemed confused and fearful, and did not seem to be taking his medication. Brown said Roussey knew little about his finances. Roussey became agitated when asked about his financial situation, displayed motor and verbal tics and deflected questions by saying, "You better ask [defendant] . . . I don't want to get in trouble. I better not say." Brown noticed some bank statements and found two checks made out to defendant for a total of $25,000. When he asked Roussey why he wrote those checks, Roussey told him he did not know and explained defendant told him he (defendant) needed the money. Brown took the bank statements and checks for further investigation.

Defendant later called Brown and complained that Roussey had not given informed consent for the removal of the bank statements and checks, and assured Brown that Roussey was doing fine. Defendant said he and his family would inherit Roussey's estate due to the care he had given Roussey. He told Brown that Roussey had taken a mortgage to cover defendant's "overhead" and Roussey's living expenses. He further explained that he had purchased a Jeep and a Cadillac for Roussey, but put the Cadillac in his own name because Roussey was not present at the Department of Motor Vehicles, and defendant had not had a chance to transfer title.

Later, when Brown met with defendant and Roussey at Roussey's home, defendant explained that Roussey was helping him through his period of financial difficulty by giving him a few thousand dollars each month. Defendant assured Brown he would provide a summary of Roussey's financial records, but he never did.

Wilson was also assigned to investigate allegations of elder financial abuse involving Roussey. When she arrived at Roussey's house, he became upset and said he needed to call defendant. Defendant told her he was Roussey's advisor and did not want her to talk to Roussey. Wilson was concerned that Roussey's reluctance to speak and his desire for defendant's approval suggested financial abuse. Wilson conducted a "mini mental examination" and Roussey scored in the normal range. However, based on their conversation, Wilson determined Roussey had cognitive impairment and was emotionally dependent on defendant. In April 2002, Wilson had Roussey's bank accounts frozen and submitted a recommendation for the conservatorship of Roussey's estate.

San Mateo County Public Guardian investigator Linda Eoff received a referral for a conservatorship of Roussey and his estate. She determined that Roussey had little understanding of his financial situation and, based on "the enormity of [the] mismanagement of his estate," recommended that county counsel petition for a conservatorship of his estate.

In mid-April 2002, Wilson and Eoff accompanied Brown while he executed a search warrant of Roussey's home. Brown subpoenaed defendant's and Roussey's financial records which revealed the large transfer of funds from Roussey to defendant from 1997 to 2002. The checks written in 2001 and 2002 were filled out by defendant and signed by Roussey. There was no evidence that defendant reimbursed Roussey.

Pursuant to a request by the judge handling the petition for Roussey's conservatorship, Michael Dirikson, chief inspector for the district attorney's office, initiated an investigation into possible elder abuse. Roussey told Dirikson he did not know how much money he had or why he refinanced his house.

Expert psychological testimony was presented by both sides. Psychologist William Lynch, called by the prosecution, testified that in October 2003, he tested Roussey's memory, ability to care for himself and intelligence. Lynch concluded Roussey suffered from a "cognitive disorder not otherwise specified," "neurocognitive impairment" and "borderline intellectual functioning"; was subject to undue influence by a person with whom he had formed a dependent relationship; and had a tendency to focus only on immediate results rather than on the long-term implications of his actions.

Psychiatrist James Missett found Roussey unable to focus on a topic, deal with details, make calculations, recall facts about his life or understand the long-term implications of his depleting assets. He determined that Roussey suffered from a cognitive disorder, his impairment was obvious to lay people, he exhibited a strong desire to please and was extremely vulnerable to undue influence.[2]

Psychologist Ronald McKinzey testified for the defense. He concluded no psychiatric reason explained Roussey's gift of money to defendant. He

---

[2] The prosecution offered additional testimony from lay witnesses who provided their assessments of Roussey's mental health. Minister Stewart Steiner testified that Roussey often seemed depressed and anxious. Kathleen Petterson, a former employee at the church Roussey attended, supervised Roussey on mundane tasks and assessed that he "did not seem to be normal in his development." Petterson said he was concerned about whether he had enough money and upset that he no longer had a car. Debra Owdom, the program coordinator for a retired seniors volunteer program, concluded Roussey had memory problems because he could not remember how to do simple tasks.

suggested Lynch had not read all of Roussey's records, had not realized Roussey had a vision problem, used outdated and inapplicable norms, failed to test Roussey for malingering even though Roussey exhibited signs he did not try to do well on the tests, and failed to realize Roussey's low score on one test indicated malingering. McKinzey concluded the tests showed Roussey had malingered, none of the results were reliable and Roussey was "[i]ndependent and fully functioning," but suffering from an antisocial personality disorder. He also determined that Roussey was no more subject to undue influence than any other person.

In rebuttal, Lynch stated he was aware of Roussey's vision problem and disagreed with McKinzey's conclusions regarding malingering and the norms used to test Roussey's mental condition. Missett testified that McKinzey's conclusions about Roussey malingering were "markedly in variance with every opinion that I've ever seen in print anywhere, by anybody, over the last, at least, 10 to 12 years."

Following the jury's verdict, defendant was sentenced to an aggregate term of five years in prison and was ordered to pay $661,400 in victim restitution. Defendant filed a timely notice of appeal.

DISCUSSION

■ Theft by larceny is a trespassory offense that is not committed when the property is taken with the owner's consent. (*People v. Davis* (1998) 19 Cal.4th 301, 305 [79 Cal.Rptr.2d 295, 965 P.2d 1165]; *People v. Werner* (1940) 16 Cal.2d 216, 225 [105 P.2d 927], overruled on other grounds in *People v. Camodeca* (1959) 52 Cal.2d 142, 147 [338 P.2d 903]; *People v. Hanselman* (1888) 76 Cal. 460, 462 [18 P. 425].) Defendant contends that all of the money and property he received from Roussey was provided consensually. The People counter that defendant's constant importuning of Roussey vitiated that consent and justified the court's undue influence instructions. Resolution of this dispute requires an examination of the common law of larceny.

### I. Larceny and the Law of Apparent Consent

Prior to the amendment of Penal Code section 484 in 1927, the criminal law recognized three types of nonforcible takings of the property of another: larceny, a common law crime, and the statutory offenses of embezzlement and obtaining title by false pretenses. (*People v. Davis, supra,* 19 Cal.4th at p. 304; 2 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against Property, § 1, p. 19.) Section 484 consolidated these three distinct offenses

into the crime of "theft."[3] Even after the amendment of section 484, however, the "elements of the several types of theft included within section 484 have not been changed." (*People v. Ashley* (1954) 42 Cal.2d 246, 258 [267 P.2d 271].) "[T]he California statute making larceny a crime is declaratory of the common law and is therefore to be construed by application of common law principles." (*Davis*, at p. 314.)

The trial court instructed the jury on theft by larceny and the elements of this offense are "well settled: the offense is committed by every person who (1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass and (5) with intent to steal the property, and (6) carries the property away. [Citations.] The act of taking personal property from the possession of another is always a trespass *unless the owner consents* to the taking freely and unconditionally or the taker has a legal right to take the property. [Citation.]" (*People v. Davis, supra,* 19 Cal.4th at p. 305, fns. omitted, italics added.)[4]

Under certain circumstances, an apparent consent is ineffective. "[I]f, by reason of infancy, insanity, or intoxication, the victim is unable to make a reasonable judgment as to the nature or harmfulness of the conduct in question," a valid consent does not exist. (1 Wharton's Criminal Law, *supra,* § 46, p. 304; accord, 1 Witkin & Epstein, Cal. Criminal Law, *supra,* Defenses, § 89, p. 428; Fricke & Alarcon, Cal. Criminal Law (10th ed. 1970) p. 37.) Force, fear and duress negate apparent consent.[5] Fraud also vitiates

---

[3] Penal Code section 484, subdivision (a) provides in pertinent part: "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft."

[4] The common law crime of larceny was said to require a " 'trespass in the taking.' " (2 LaFave & Scott, Substantive Criminal Law (1986) § 8.1, p. 328.) If the owner of the property actually consents to the defendant's taking his property, there is no trespass in the taking and hence no larceny. (See *People v. Edwards* (1925) 72 Cal.App. 102, 112–113 [236 P. 944] ["The taking . . . must be against the will of the owner or at least without his consent."], disapproved on other grounds in *In re Estrada* (1965) 63 Cal.2d 740, 748 [48 Cal.Rptr. 172, 408 P.2d 948]; 1 Wharton's Criminal Law (15th ed. 1993) § 46, pp. 303–304 ["consent destroys the criminal character of an act of . . . taking the property of another which would otherwise constitute larceny"].) Thus, while a lack of consent is not an essential element of the crime, consent is an affirmative defense. (1 Witkin & Epstein, Cal. Criminal Law, *supra,* Defenses, § 88, p. 427.)

[5] " 'Robbery is larceny, committed by violence . . . .' [Citation.]" (*People v. Nelson* (1888) 56 Cal. 77, 80.) It is " 'the felonious taking of personal property . . . against [the victim's] will, accomplished by means of force or fear.' " (*Ibid.*) "If the threat generates a well-grounded fear that the property must be handed over to avoid serious personal injury, the submission thereto is not consent and obtaining property by this means is robbery." (Perkins & Boyce, Criminal

consent. (*People v. Traster* (2003) 111 Cal.App.4th 1377, 1388–1389 [4 Cal.Rptr.3d 680]; 2 Witkin & Epstein, Cal. Criminal Law, *supra*, Crimes Against Property, § 14, p. 33.)[6]

Though never adopted in California, the Model Penal Code sets out a definition of ineffective consent in criminal cases, including theft, that is instructive. After noting that the law on ineffective consent "is neither difficult nor controversial," the commentary provides: "Four situations are contemplated in which assent will not constitute an excusing consent. The first occurs where one who is not legally entitled to give consent purports to do so, as where a stranger 'consents' to the removal of another's property. Secondly, consent is vitiated in those situations where it is given by one who, by reason of youth, mental disease or defect, or intoxication, is manifestly unable, or known by the actor to be unable, to make a reasonable judgment as to the harm that would be incurred by virtue of the consent. A drunk who 'consents' to the taking of his property may pose an illustration. The third situation, of which statutory rape is a clear example, involves consent by a person whose improvident consent is the very objective sought to be prevented by the law defining the offense. And finally, consent is deemed to be ineffective if it is induced by force, duress or deception of a kind sought to be prevented by the law defining the offense." (Model Pen. Code & Commentaries (1985) com. 3 to § 2.11, pp. 398–399, fns. omitted.)

## II. *The Trial Court's Instructions on Consent*

Consistent with common law principles, the trial court instructed the jury with CALJIC No. 1.23: "To consent to an act or transaction, a person: (1) must act freely and voluntarily and not under the influence of threats, force or duress; (2) must have knowledge of the true nature of the act or transaction involved; and (3) must possess the mental capacity to make an intelligent choice whether or not to do something proposed by another person. [¶] Merely being passive does not amount to consent. Consent requires a free will and positive cooperation in act or attitude."

However, the court supplemented this instruction with the following: "If you find, beyond a reasonable doubt, that defendant exerted undue influence

---

Law (3d ed. 1982) p. 1077.) Courts have consistently applied the common law rule that force, fear or duress negates consent for the purpose of proving a taking has occurred. (*People v. Webster* (1991) 54 Cal.3d 411, 441–442 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People v. Marshall* (1957) 48 Cal.2d 394, 397 [309 P.2d 456]; *People v. Rush* (1993) 16 Cal.App.4th 20, 23 [20 Cal.Rptr.2d 15], overruled on other grounds in *People v. Montoya* (2004) 33 Cal.4th 1031, 1036 [16 Cal.Rptr.3d 902, 94 P.3d 1098].)

[6] Despite evidence that defendant obtained some property from Roussey through misrepresentations, the prosecutor apparently never sought an instruction to this effect and none was provided.

over . . . Roussey, you may but are not required to find that . . . Roussey did not consent to the subject transactions. Your finding that . . . Roussey did not consent to the subject transactions must be found beyond a reasonable doubt." The court then adopted the formulation of undue influence set out in Civil Code section 1575, and gave the following special instruction: "Undue influence exists where a defendant does one or more of the following: [¶] (1) In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him; [¶] (2) In taking an unfair advantage of another's weakness of mind; or [¶] (3) In taking a grossly oppressive or unfair advantage of another's necessities or distress." To this statutory definition, the court added an additional alternative rooted in the case law: "Whether from weakness on one side, or strength on the other, or a combination of the two, undue influence occurs whenever there results that kind of influence or supremacy of one mind over another by which that other is prevented from acting according to his own wish or judgment, and whereby the will of the person is overborne and he is induced to do an act which he would not do, if left to act freely." (See *Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1124 [252 Cal.Rptr. 122, 762 P.2d 46].) Defendant has challenged these modifications to the standard consent instruction.

■ When evaluating jury instructions, we follow familiar rules. "Jury instructions must be read together and understood in context as presented to the jury. Whether a jury has been correctly instructed depends upon the entire charge of the court. [Citations.]" (*People v. Tatman* (1993) 20 Cal.App.4th 1, 10 [24 Cal.Rptr.2d 480].) Jurors are presumed to be intelligent persons capable of understanding and correlating jury instructions. (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338 [161 Cal.Rptr. 35].) An erroneous instruction requires reversal only when it appears that the error was likely to have misled the jury. (Cal. Const., art. VI, § 13; *Tatman*, at p. 10.)

■ From the court's instructions, we believe the jury understood it could not convict the defendant of either crime unless it believed beyond a reasonable doubt that Roussey did not consent to the monetary transfers, but it could convict defendant if it found beyond a reasonable doubt that Roussey's consent resulted from defendant taking unfair advantage of Roussey's "weak mind."

■ These instructions are far too inclusive to act as a standard for negating apparent consent in a criminal prosecution for theft by larceny. Undue influence, as the trial court defined it, is little more than over-

persuasion. "The hallmark of [the Civil Code's definition of undue influence] is high pressure, a pressure which works on mental, moral, or emotional weakness to such an extent that it *approaches the boundaries of coercion. . . .* [Citation.] Misrepresentations of law or fact are not essential to the charge, for a person's will may be overborne without misrepresentation. By statutory definition[,] undue influence includes 'taking an unfair advantage of another's weakness of mind, or . . . taking a grossly oppressive and unfair advantage of another's necessities or distress.' [Citation.] While most reported cases of undue influence involve persons who bear a confidential or authoritative relationship to one another, a confidential . . . relationship between the parties need not be present when the undue influence involves unfair advantage taken of another's weakness or distress. [Citations.]" (*Odorizzi v. Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 130 [54 Cal.Rptr. 533], italics added.) The court's instructions on undue influence render persuasion short of coercion or misrepresentation sufficient to prove a theft, even where the victim does not lack the mental capacity to consent. These instructions create a substantial risk of conviction whenever an accused benefited so greatly from a transaction that the jury is convinced that the victim acted unreasonably in entering into it.[7]

The People defend the court's undue influence instructions in several ways. First, they argue that the instructions are justified by certain provisions of the

---

[7] At trial, the People presented evidence of a prior offense of elder abuse that demonstrates the broad reach of the trial court's definition of theft. Forsyth testified that he had been practicing law since 1950, after graduating from Boalt Hall School of Law. In April 1991, he hired defendant at his law firm. Forsyth's mother had recently died and his wife was terminally ill. Defendant was initially paid an hourly rate and performed clerical work, though he was a law school graduate. Forsyth and defendant became friends, and defendant's job responsibilities grew. Eventually, the relationship deteriorated as the two men differed over the services to be offered to clients and the fees that should be billed. Defendant also requested higher compensation, but Forsyth could not afford it. In 1996, Forsyth informed defendant that he was considering terminating him, and defendant initially asked for a severance payment of $100,000. Forsyth hired an attorney to represent him in negotiations with defendant and that attorney advised Forsyth he had no legal obligation to make any severance payment. During formal negotiations, in which both men were represented by counsel, defendant demanded $200,000 and Forsyth ultimately paid him $130,000. On one occasion during the negotiations, in the presence of counsel, defendant spoke in a loud voice, became distraught and ran from the room. Earlier, during disagreements over management of the law office, defendant had acted in a manner that Forsyth found intimidating.

The People sought admission of this evidence under Evidence Code section 1109, subdivision (a)(2) as "prior elder/financial abuse," and, on appeal, argue the trial court's decision to admit the evidence was appropriate because defendant's treatment of Forsyth constituted "a similar form of elder abuse." In effect, the People argue that the size of the payment negotiated *with the assistance of counsel* was so unreasonable in the circumstances that it must have resulted from defendant taking unfair advantage of Forsyth's weakness of mind. Pursuant to the trial court's instructions, hard bargaining becomes theft.

Civil Code. Civil Code section 1567[8] provides that undue influence undermines apparent consent, and Civil Code section 1575[9] defines undue influence in the same fashion as the trial court, which expressly relied on the Civil Code for these instructions. It is significant, however, that these two Civil Code sections define the consent necessary for contract formation and the factors that undermine such consent.[10] Undue influence may also invalidate the execution or revocation of a will. (Prob. Code, § 6104.) But the People provide no reason in law or logic for concluding that the same factors that make a contract voidable or a will ineffective should, without more, justify a criminal conviction for theft.

The People argue Penal Code section 1102 and Civil Code section 23.2 provide additional justification for adoption of this civil standard in criminal prosecutions. This argument is meritless. Penal Code section 1102, enacted prior to codification of our Evidence Code, simply states that "[t]he rules of evidence in civil actions are applicable also to criminal actions." But the undue influence provisions in the Civil Code are not "rules of evidence"; they are substantive provisions that, if we accept the People's argument, will define theft by larceny in a fashion that converts otherwise lawful activity into a crime.

The People rely on *People v. Hewlett* (1951) 108 Cal.App.2d 358 [239 P.2d 150] to support their argument regarding Penal Code section 1102. *Hewlett* upheld an embezzlement conviction of an attorney who had obtained a written gift instrument for the subject property from his client, while the client was hospitalized and incompetent. (*Hewlett*, at pp. 362, 365, 378.) The court approved a series of instructions "informing the jury that a presumption of undue influence arises where a trustee obtains an advantage over his beneficiary." (*Id.* at p. 369.) These instructions had been challenged on the basis that they deprived the defendant of "the presumption of innocence." (*Id.* at pp. 369, 371.) The court rejected this argument, relying on examples of other presumptions that had been enacted in the Penal Code and approved by

---

[8] Civil Code section 1567 provides: "An apparent consent is not real or free when obtained through: [¶] 1. Duress; [¶] 2. Menace; [¶] 3. Fraud; [¶] 4. Undue influence; or, [¶] 5. Mistake."

[9] Civil Code section 1575 provides: "Undue influence consists: [¶] (1) In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him; [¶] (2) In taking an unfair advantage of another's weakness of mind; or, [¶] (3) In taking a grossly oppressive and unfair advantage of another's necessities or distress."

[10] Each section is located in chapter 3, title 1, part 2 of division 3 of the Civil Code, "Nature of Contract," "Consent." Civil Code section 1565 requires that the parties' consent to a contract must be free, mutual and communicated to each other. Civil Code section 1566 provides: "A consent which is not free . . . may be rescinded by the parties, in the manner prescribed by the Chapter on Rescission." Finally, Civil Code section 1567 lists the factors that disprove apparent consent, one of which is undue influence.

the courts. The court went on to conclude that any civil presumption could be used in a criminal case because all presumptions constitute evidence, the laws relating to presumptions are rules of evidence and section 1102 extends the rules of evidence in civil cases to criminal actions. (*Hewlett*, at pp. 374–375.)

*Hewlett* provides little assistance to the People. First, the Evidence Code, which was enacted many years after *Hewlett*, has specifically rejected the rule that presumptions are evidence. (Evid. Code, § 600, subd. (a) ["A presumption is not evidence."].) Second, the People fail to refer us to any presumption expressly set out in the Civil Code (or Evidence Code) that was applied in our case. Finally, the instruction given in this case was far broader than the instruction given in *Hewlett*, which addressed only the influence exercised by a fiduciary.[11]

■ The People's reliance on Civil Code section 23.2 is equally misplaced. That section merely requires that we treat the Civil and Penal Codes as if they "had been passed at the same moment of time and were parts of the same statute." That is, we must construe the two codes together and attempt to give effect to the provisions in each. (*Gonzales v. Wasson* (1876) 51 Cal. 295, 297; *Granite Construction Co. v. Superior Court* (1983) 149 Cal.App.3d 465, 469–470 [197 Cal.Rptr. 3].) But the People's argument that section 23.2 compels the conclusion "that the Civil Code definition of undue influence is applicable in criminal trials" goes too far. Nothing in our decision implicates section 23.2, because restricting larceny to its common law boundaries leaves intact the rules of contract formation in the Civil Code.

Finally, the People suggest that any apparent problem with the instructions on undue influence is eliminated by subsequent instructions requiring that lack of consent be proved beyond a reasonable doubt and that a good faith belief in consent, though unreasonable, is a defense to theft by larceny. We are unpersuaded. The instructions erroneously expand the list of factors that negate apparent consent. Subsequent instructions requiring proof of nonconsent beyond a reasonable doubt, or providing a defense for a good faith though unreasonable belief in consent, do not cure the problem because they incorporate the faulty definition of consent. That is, the jury could conclude beyond a reasonable doubt that consent did not exist because Roussey was weak-minded and that defendant lacked good faith because defendant knew Roussey was vulnerable.

---

[11] Given the breadth of the challenged jury instruction and the resolution we reach, we need not examine whether the crime of theft is committed whenever one party receives money or property from another as a result of breaching his or her fiduciary duty to that other party.

## III. *Penal Code Section 368, Subdivision (d)*

In count 1, defendant was convicted of violating Penal Code section 368, subdivision (d) (hereafter section 368(d)), crimes against elder or dependent adults, by committing a theft of money or personal property exceeding $400 knowing that the victim was an elder or dependent adult. The People argue that even if undue influence does not negate apparent consent in a theft prosecution, we should interpret the theft provisions of the elder abuse statute, section 368(d), more broadly in order to protect certain vulnerable victims. We disagree.

■ In interpreting a statute we follow familiar rules. "The first principle of statutory interpretation is that, to ascertain the Legislature's intent, we turn initially to the words of the statute, and if ' "the statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it. [Citation.] The plain language of the statute establishes what was intended by the Legislature." ' [Citation.]" (*People v. Johnson* (2006) 38 Cal.4th 717, 723–724 [42 Cal.Rptr.3d 887, 133 P.3d 1044].) ■ Section 368(d) provides: "Any person who is not a caretaker who violates *any provision of law proscribing theft,* . . . with respect to the property . . . of an elder or a dependent adult, and who knows or reasonably should know that the victim is an elder or a dependent adult, is punishable [as set forth.]" (Italics added.) The italicized portion clearly demonstrates the Legislature's intent to rely on the definition of theft contained in other statutes and is inconsistent with the argument that the Legislature intended to create a unique definition of theft for this statute.

The People note, however, that in Penal Code section 368, subdivision (a) (hereafter section 368(a)) the Legislature stated its intent to provide "special consideration and protection" to elders and dependent adults because of their increased vulnerability.[12] The People suggest we should implement this intent and provide increased protection to an elder adult who consents to providing property to another as a result of undue influence, by treating this transaction as a theft. Because of the clear language in section 368(d), we decline to do so. But, this unwillingness does not frustrate the legislative intent to protect vulnerable members of our community because the statute provides for an increased penalty when the victim is a member of the protected class. When, as in this case, the defendant is convicted of stealing more than $400 from an

---

[12] Section 368(a) provides: "The Legislature finds and declares that crimes against elders and dependent adults are deserving of special consideration and protection, not unlike the special protections provided for minor children, because elders and dependent adults may be confused, on various medications, mentally or physically impaired, or incompetent, and therefore less able to protect themselves, to understand or report criminal conduct, or to testify in court proceedings on their own behalf."

elder adult, the normal penalty for grand theft is increased by one year. Thus the legislative intent is effectuated without an unwarranted expansion of the definition of theft in section 368(d).

## IV. *Harmless Error*

"The nature of this harmless error analysis depends on whether a jury has been presented with a legally invalid or a factually invalid theory. When one of the theories presented to a jury is legally inadequate, such as a theory which ' "fails to come within the statutory definition of the crime" ' [citations], the jury cannot reasonably be expected to divine its legal inadequacy. The jury may render a verdict on the basis of the legally invalid theory without realizing that, as a matter of law, its factual findings are insufficient to constitute the charged crime. In such circumstances, reversal generally is required unless 'it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory.' [Citation.]" (*People v. Perez* (2005) 35 Cal.4th 1219, 1233 [29 Cal.Rptr.3d 423, 113 P.3d 100].) "[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand." (*People v. Green* (1980) 27 Cal.3d 1, 69 [164 Cal.Rptr. 1, 609 P.2d 468].)[13]

Here, the instructions presented the jury with alternate theories for finding guilt, some of which were legally correct and supported by substantial evidence. For example, the jury could have found defendant guilty on the theories that he obtained Roussey's consent by duress or by misrepresentation. However, the instructions on undue influence were erroneous, at least to the extent the jury was permitted to convict if it believed defendant took unfair advantage of Roussey's "weak mind." The prosecutor argued the erroneous legal theory to the jury, and, on more than one occasion, expressly conceded that her case was focused on undue influence. Nothing in the record demonstrates that the jury necessarily rejected this theory and convicted

---

[13] In a petition for rehearing, the People argue that the *Green* analysis may no longer be valid and rely on *People v. Harris* (1994) 9 Cal.4th 407, 424, footnote 11 [37 Cal.Rptr.2d 200, 886 P.2d 1193], where the court said the *Green* analysis "could be questioned." The People contend that when the jury is given both a legally correct and legally incorrect instruction on the elements of the crime, the proper harmless error test is: If the jury had been given only the proper instruction, is it clear beyond a reasonable doubt that the same conviction(s) would have resulted. As an intermediate appellate court, we are not free to anticipate a future change of direction by our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) In any event, based on the evidence presented and the prosecutor's closing argument, we would find the instructional error reversible under any standard. (*People v. Perez, supra*, 35 Cal.4th at pp. 1236–1237 (conc. opn. of Brown, J.).)

defendant on the theory that he obtained possession of the property by duress or by misrepresentations. Given the evidence and arguments, we conclude there is a reasonable probability defendant's conviction was based on the legally insupportable theory that Roussey's consent to the property transfers was undermined by the defendant's exercise of undue influence. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Thus, the instructional error was prejudicial.[14]

### DISPOSITION

The judgment is reversed.[15]

Jones, P. J., and Reardon, J.,[*] concurred.

A petition for a rehearing was denied November 9, 2006, and the opinion was modified to read as printed above.

---

[14] Because we reverse on this basis, we need not address defendant's other claims of error.

[15] Defendant filed a separate petition for writ of habeas corpus (*In re Brock* (Oct. 11, 2006, A114457 [summary denial]). In light of our reversal of his conviction in this appeal, we have denied that petition as moot by separate order filed this date.

[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.