Filed 10/8/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>GLENN ANDREW NEASHAM,<br><br>　　　　Defendant and Appellant. | A134873<br><br>(Lake County<br>Super. Ct. No. CR925185) |

　　　　Defendant Glenn Andrew Neasham, a licensed insurance agent, appeals his conviction for committing theft from an elder and dependent adult by selling her an annuity policy which the prosecutor argued to the jury "was an unsuitable product for her age" despite its approval for sale to such a person by the California Department of Insurance. Although there was conflicting evidence as to the elder's inability to understand the nature of the transaction, there was no evidence that defendant appropriated the elder's funds to his own use or to the benefit of anyone other than the elder herself, nor was there evidence that defendant made any misrepresentations or used any artifice in connection with the sale. Moreover, the jury was incorrectly instructed that to convict it need find only that the purchase of the annuity deprived the elder of a major portion of the value or enjoyment of her property, eliminating the necessity of proving that defendant had any such intention. Hence, defendant's conviction must be reversed.

**Background**

　　　　In early February 2008, 83-year-old Fran Schuber and the 82-year-old man with whom she had been living for 15 years, Louis Jochim, made an unsolicited visit to defendant's office to discuss the purchase of an annuity by Schuber. Jochim had been a client of defendant for some 10 years and had previously purchased an annuity from him,

1

which he considered a good investment. According to Jochim, "Fran thought she wanted to do the same thing I was doing."

The particular annuity that was discussed and which Schuber purchased is labeled a "MasterDex 10 Annuity" and is issued by Allianz Life Insurance Company of North America (Allianz). The annuity is approved by the California Department of Insurance for sale to persons through the age of 85 years. The premium Schuber paid for the annuity was $175,000, to which Allianz adds a $17,500 "premium bonus" if the policy is annuitized after the fifth year, so that the "annuitization value" of the policy becomes $192,500 plus accrued interest. Under the terms of the policy, interest on the principal accrued at 3.25 percent per annum the first year and at no less than 2 percent per annum thereafter.  Except in the event of the annuitant's extended confinement to a hospital or certain long-term care facilities after the policy has been in effect for one year, the policy imposes a substantial penalty for the withdrawal of more than 10 percent of the principal during the first five years of the policy; thereafter, installments are paid to the annuitant over the following 10 years. As of the time of trial in October 2011, the policy had a secondary market value of $180,000. At the expiration of the five-year waiting period in February 2013, the value of the policy would be $224,228, with the right to receive 120 monthly payments of $1,962, totaling $235,440 over the 10-year period.

The policy authorizes the annuitant to assign or transfer ownership rights of the policy  and permits the annuitant to borrow up to half of the cash surrender value of the policy, not to exceed $50,000, at an interest rate of 7.4 percent in advance. In the event of the death of the annuitant, the beneficiary named in the policy — here Jochim[1] — receives all remaining unpaid benefits.

Defendant received a commission of approximately 8 percent from Allianz upon the purchase of the annuity.

---

[1] In the event Jochim was no longer living, his daughter was named as the contingent beneficiary. Schuber's largely estranged son, Ted, was not named as a beneficiary.

There was evidence that when Schuber and Jochim met with defendant on February 4, 2008, defendant explained the terms of the MasterDex 10 Annuity, contrasted those terms and benefits with the terms of certificates of deposit, and that Schuber signed, among other documents, a form acknowledging that she had read the information setting out the values and factors that affect the value of the annuity, that the information had been explained to her by defendant, and that she understood that the values shown, other than the guaranteed minimum values, were not promises or guarantees. Jochim testified that Schuber "was very clear in her mind at that time." Defendant's former assistant who was present for much of the conversation testified that "[s]he seemed like a very competent woman to me. She knew what she was doing and what she was signing and everything that entailed that. She didn't seem like somebody who didn't understand what she was doing." Another former assistant, who was present when defendant conducted a subsequent review of the policies with Schuber and Jochim, testified that Schuber told defendant she "definitely" understood the policy. At one point, the examination continued:

"Q. And was she asked any questions during that interview if you remember?

"A. [Defendant] always asked, 'Are you sure you understand what you're [sic] choices are?' What's going on and those are the kinds of questions that were asked and she answered. [¶] . . . [¶]

"Q. And then did she repeat back her understanding besides just saying yes?

"A. A couple times, yes, and she did understand.

"Q. Okay. What did she say?

"A. She explained to [defendant] she understood that if she takes out early there's going to be a big surrender penalty. . . . "

From defendant's office, Schuber and Jochim went to the bank to withdraw $175,000 from a $228,277.09 certificate of deposit that Schuber held. Defendant called the bank before Schuber arrived to advise that she was coming and told the bank employee, Susie Robinson, that he would report the matter to the district attorney if there was any delay in making the withdrawal. From past dealings, Robinson believed that

3

Schuber had memory problems, Schuber having come to the bank many times to inquire who the beneficiary of her certificate of deposit was, and several times to change the beneficiary. Robinson testified that when Schuber and Jochim arrived at the bank after defendant's call, she became concerned that Schuber was confused and was being influenced by Jochim.[2] Robinson telephoned defendant and told him that Schuber did not understand the transaction but issued her a check for $175,000 payable to Allianz, which Schuber brought to defendant. When defendant delivered the annuity policy to Schuber on February 13, both she and Jochim signed a handwritten statement prepared by defendant confirming that Schuber purchased a "tax deferred fixed indexed annuity," that Jochim was her "chosen beneficiary," and that she knew certain of its terms.

After Schuber left the bank with the check on February 4, Robinson contacted a social worker at the Department of Social Services, advising that Schuber "had withdrawn $175,000 and the bank felt that her boyfriend was exerting undue influence on her." As a result of this alert to potential elder abuse, over the succeeding months Schuber and others were interviewed by several government investigators who testified at trial. In short, these investigators and others, including Schuber's son and daughter-in-law, testified that in their interactions with Schuber both before and after her purchase of the annuity, Schuber was generally confused, forgot what she had just been told, and indicated in many ways that she was suffering from dementia. The People's evidence included a video recording of an August 16, 2011 conversation between Schuber and an investigator from the district attorney's office reflecting Schuber's condition at that time, which the investigator compared to what he testified was her appearance when he

---

[2] Robinson testified, "I did try to talk with [Schuber] but [Jochim] kept interrupting and talking over her and she always just remained quiet. . . . I asked her several questions. I asked her if she knew why she was in my office and she said she was there to make a withdrawal. And I asked her if she knew the amount. She did. I asked her if she knew what she was going to do with it. She said she was going to take it to [defendant]. I asked her what kind of product . . . are you going to invest in with [defendant]? Did he explain it to you? And she reverted back to not answering questions and didn't have an answer. She said, 'I'm really confused. I don't know what he's going to do with it.'"

interviewed her in April 2008 and which other witnesses compared to the condition they testified she reflected when they spoke with her on earlier occasions.

By a complaint filed on December 8, 2010, and an information filed on April 15, 2011, defendant was charged with committing "a violation of [s]ection 368(d) of the California Penal Code, in that said defendant on or about the 1st day of February, 2008 to the 28th day of February, 2010 . . . committed theft and embezzlement with respect to the property of an elder and dependent adult, said property having a value exceeding $950.00, and knew and reasonably should have known that said person, Fran Schuber, was an elder and dependent adult." The information also contained special allegations under sections 12022.6, subdivision (a) and 1203.045, subdivision (a) that the theft was of property in excess of $50,000 and $100,000, respectively.

At the conclusion of trial, the jury was instructed that to find defendant guilty of violating Penal Code[3] section 368 the prosecution must prove, among other elements, that "the defendant committed theft." To find defendant guilty of "grand theft by larceny in violation of . . . section 484," it was necessary that the prosecution prove the following: "1. The defendant took possession of property owned by someone else; 2. The defendant took the property without the owner's consent; 3. When the defendant took the property he intended to deprive the owner of it permanently; or removed it from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property; and 4. The defendant moved the property, even a small distance, and kept it for any period of time, however brief." The jury was also instructed that "to consent to an act or transaction, a person (1) must act freely and voluntarily and not under the influence of threats, force or duress; (2) must have knowledge of the true nature of the act or transaction involved; and (3) must possess the mental capacity to make an intelligent choice whether or not to do something proposed by another person. Merely being passive does not amount to consent. Consent requires a free will and positive cooperation in act or attitude."

---

[3] All statutory references are to the Penal Code unless otherwise noted.

The jury was further instructed that "if the defendant obtained property under a claim of right, he did not have the intent required for the crime of theft. The defendant obtained property under a claim of right if he believed in good faith that he had a right to the specific property or a specific amount of money, and he openly took it. In deciding whether the defendant believed that he had a right to the property and whether he held that belief in good faith, consider all the facts known to him at the time he obtained the property, along with all the other evidence in the case. The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable. But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith." Finally, the jury was also instructed that "if you find that the defendant believed that Fran Schuber had the ability to consent to the contract into which she entered with him, he did not have the specific intent or mental state required for theft from an elder adult."

The jury returned a verdict finding defendant guilty of violating section 368, subdivision (d), but found that the amount of the theft was not over $50,000 or $100,000.[4] Following the denial of post-trial motions, defendant filed a timely notice of appeal.

## Discussion

Section 368, subdivision (d) prescribes the punishment for any person not a caretaker "who violates any provision of law proscribing theft, embezzlement, forgery, or fraud . . . with respect to the property . . . of an elder or a dependent adult, and who knows or reasonably should know that the victim is an elder or a dependent adult."[5] The provision of law that now proscribes theft and embezzlement is section 484, subdivision (a), which provides in relevant part that "[e]very person who shall feloniously steal, take,

[4] Since the property taken from Schuber presumably was the $175,000 she paid for the annuity, the guilty verdict appears irreconcilable with the findings on the enhancement allegations. However, the inconsistency provides no basis for reversal of the verdict (*People v. Miranda* (2011) 192 Cal.App.4th 398, 405-406) and defendant does not argue otherwise.

[5] An "elder" is defined as any person who is 65 years of age or older. (§ 368, subd. (g).)

carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money . . . is guilty of theft." Since 1927, section 484 has thus incorporated into a single statute what formerly were the three separate offenses of "(a) larceny, the common law crime involving a trespassory violation of possession . . . ; (b) embezzlement, the statutory offense of appropriation by a fiduciary in lawful possession . . . ; and (c) obtaining title to property by false pretenses . . . ." (2 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against Property, § 1, p. 21; *People v. Williams* (2013) 57 Cal.4th 776, 781-786; *People v. Brock* (2006) 143 Cal.App.4th 1266, 1274-1275.)[6] "The consolidation did not create new crimes or enlarge the scope of any of the three old ones. Hence, it is necessary to prove the substantive elements of one of the offenses, and prior decisions on the elements of larceny, embezzlement, and false pretenses are still authority." (2 Witkin & Epstein, *supra,* § 3 at p. 23;[7] *People v. Davis* (1998) 19 Cal.4th 301, 304-305 .) Recognizing that the elements of the former offenses differ, the standard criminal instructions approved by the Judicial Council contain several different instructions defining the elements of theft that may be appropriate in particular cases: CALCRIM No. 1800, entitled "Theft by Larceny" (the instruction given in the present case in modified form, as discussed below); CALCRIM No. 1804, entitled "Theft by False Pretense;" CALCRIM No. 1805, entitled "Theft by Trick;" and CALCRIM No. 1806, entitled "Theft by Embezzlement."

---

[6] Section 484, subdivision (a) defines theft to also include one "who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another."

[7] The text of the Witkin & Epstein treatise continues by pointing out that "the particular case need not ultimately fit into one category to the exclusion of the others. The offenses are so related that, on different interpretations of the facts, the same acts may sometimes fall under two or even all three categories." (2 Witkin & Epstein, *supra,* § 3 at p. 23.)

"The elements of theft by larceny are well settled: the offense is committed by every person who (1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass and (5) with intent to steal the property, and (6) carries the property away. [Citations.] The act of taking personal property from the possession of another is always a trespass unless the owner consents to the taking freely and unconditionally." (*People v. Davis, supra,* 19 Cal.4th at p. 305, fns. omitted.)

Under the instructions that were given in this case, to convict it was necessary that the jury find defendant "took possession" of Schuber's funds knowing that she did not have the ability to make an intelligent decision to purchase the annuity. Defendant and the amici argue that the evidence was insufficient to support findings that Schuber did not understand the essential terms of the annuity when she decided to purchase it or that defendant should have realized her incapacity. There is some force to this argument since all of the witnesses to the discussions between Schuber and defendant confirm Schuber's apparent comprehension at the time of their conversations, and prosecution witnesses acknowledged that persons with dementia can have periods of apparent lucidity. Nonetheless, we shall assume the testimony that before and after the purchase of the annuity, investigators and family members observed Schuber as confused, forgetful, and giving indications of dementia was sufficient to support findings that Schuber was incapable of giving informed consent to the transaction and that her condition at that time was such that it should have been apparent to defendant.[8] (But cf. *People v. Brock, supra,* 143 Cal.App.4th 1266 [reversing conviction for elder abuse by theft based on instruction that weakness of mind could render ineffective elder's consent to delivery of funds to defendant; "the People provide no reason in law or logic for concluding that the same

---

[8] In view of the conclusions we reach on other issues, we need not consider defendant's contention that the trial court erred in receiving into evidence over defendant's objection, and permitting the jury to view, a video of a conversation with Schuber occurring more than three years after her purchase of the annuity. By that time Schuber's mental condition unquestionably had deteriorated and the prejudicial impact of the video may well have outweighed its relevance.

8

factors that make a contract voidable or a will ineffective should, without more, justify a criminal conviction for theft"].)[9]

Even assuming that Schuber was incapable of giving effective consent to the purchase of the annuity, defendant's acceptance of payment for the annuity cannot be considered a trespassory taking of possession of her property within the meaning of the larceny instruction. "This instruction applies to situations where a defendant physically takes property from another's actual or constructive possession." (*People v. Beaver* (2010) 186 Cal.App.4th 107, 122.)[10] Defendant received Schuber's cashier check payable to Allianz and transmitted it to the insurance company, which issued her the annuity policy. He did not take her funds or convert her property for his own use or the use of any other person; as the amici argue, he did not deprive her of any property but instead placed her funds into an investment instrument of equal value to the monies withdrawn from her certificate of deposit. The annuity was issued in Schuber's name and she at all times was the owner of that policy. For 30 days after its issuance, she had the unqualified right to cancel the policy and receive back the full price paid for the policy. While the prosecution placed great emphasis on the penalty she might have incurred had she

---

[9] In *Brock*, the court recognized that " '[i]f, by reason of infancy, insanity, or intoxication, the victim is unable to make a reasonable judgment as to the nature or harmfulness of the conduct in question,' a valid consent does not exist" (*People v. Brock, supra,* 143 Cal.App.4th at p. 1275) and did not directly take issue with the requirements of effective consent specified in CALJIC No. 1.23, the instruction used by the court in the present case. The trial court there also told the jury that undue influence could negate consent and that undue influence exists in, among other conduct, "taking an unfair advantage of another's weakness of mind." (*Id.* at p. 1277.) The facts in *People v. Brock* were more extreme than those in the present case. There the elder wrote numerous checks to the defendant and deposited money into the defendant's account, the defendant having told the elder not to discuss those payments with others. Nonetheless, the appellate court rejected the People's arguments that would "define theft by larceny in a fashion that converts otherwise lawful activity into a crime." (*Id.* at p. 1279.)

[10] In *Beaver*, the court continued: " That is not the case here. Defendant did not take [the owner's] property. [The owner] gave it to defendant under the false pretense that defendant had been injured due to the fault of [the owner]." (*People v. Beaver*, *supra*, 186 Cal.App.4th at p. 122.) "This was theft by false pretenses, not larceny." (*Id.* at p. 121.)

9

withdrawn more than 10 percent of the policy value within five years of its issuance, there was no evidence that Schuber had any intention or need to make such a withdrawal, the penalty did not apply if she became hospitalized or moved to a long-term care facility and, most importantly, there was no evidence that this standard term reduced the value of the policy to less than she paid for it. [11]

The prosecutor argued, and the jury apparently agreed, that transferring her funds from a certificate of deposit to the annuity was not in Schuber's best interests because of her age.[12] That, however, is a matter of judgment over which reasonable persons can, and the witnesses did, disagree. Whether or not in Schuber's best interests, the policy was approved by the California Department of Insurance for sale to persons of Schuber's age. Treating the sale to Schuber as a trespassory taking of her money would indeed "convert[] otherwise lawful activity into a crime." (*People v. Brock, supra,* 143 Cal.App.4th at p. 1279.) Under the prosecution's theory of this case, merely cashing a check for a person known to suffer from dementia would support a larceny conviction.

---

[11] Lack of consent by a person capable of giving informed consent may support a larceny conviction where property has been taken from such a person without an exchange of equivalent value. (E.g., *People v. Catley* (2007) 148 Cal.App.4th 500, 505.) In emphasizing the equivalence in the value of the property given and the property received in this case, we do not necessarily limit consideration to monetary values. We have no occasion to consider here a situation in which one gives an incapacitated person fair market value for an heirloom or other item of significant sentimental value. The present case involves only equivalent monetary values – exchanging money withdrawn from a certificate of deposit for an annuity policy of equivalent market value.

[12] That was the principal theme of the prosecutor's closing argument: "And why was this [annuity] a lemon? Why was it moldy bread? It was an unsuitable product for her age. [¶] You heard Mr. Granger [an annuity and insurance consultant] talk about late in life issues, the need for extended care and for nursing homes and how much that costs. And you need liquidity. You've heard that from also the defense expert too as well, that you need money for emergencies. [¶] And her CD was not completely liquid. She was also having some penalties there. But it was liquid once a year and she could basically reach it once a year. And as I said, maybe it was better off under her mattress or maybe in a fireproof safe because of her age issues and not just her health issues. [¶] And as Neil Granger said, basically the problem with annuities just in general because he said he wouldn't sell them anyways, you just never get your money back in that lump sum. And he particularly said this was not good for somebody over — basically 65 or older."

It is important to note that the prosecution did not allege, and the jury was not instructed to determine, that defendant made any misrepresentations to Schuber (or to Jochim or anyone else) concerning the terms of the annuity.[13] Had defendant induced Schuber to purchase the policy by means of misrepresenting the terms of the policy or by other means of trickery or artifice, at common law the offense would not have been larceny but obtaining title to property by false pretenses, and the appropriate instructions would have been those now set out in CALCRIM No. 1804 or CALCRIM No. 1805. (See *People v. Traster* (2003) 111 Cal.App.4th 1377, 1386-1390 [distinguishing theft by false pretenses from theft by trick and device]; see also *People v. Williams, supra*, 57 Cal.4th at p. 794.) Since no such duplicity was alleged or proved here, theft within the meaning of section 484 required proof that defendant committed common law larceny (there being no suggestion of embezzlement); that is, that defendant committed a "trespassory taking" of Schuber's property, or, in common parlance, that defendant stole from Schuber.

"While a general verdict of guilt may be sustained on evidence establishing any one of the consolidated theft offenses [citations], the offense shown by the evidence must be one on which the jury was instructed and thus could have reached its verdict." (*People v. Curtin* (1994) 22 Cal.App.4th 528, 531.) This broad statement has been qualified when the theft offense on which the defendant was convicted was subsumed within a different theft offense on which the jury was instructed. (*People v. Counts* (1995) 31 Cal.App.4th 785, 791-792; see *People v. Fenderson* (2010) 188 Cal.App.4th 625, 637-640.) But it was reaffirmed in *Beaver,* where, as here, the prosecution was not required to prove the elements of the uncharged offense. (*People v. Beaver, supra,* 186 Cal.App.4th at p. 125.)

---

[13] The prosecutor did, in closing, characterize defendant's "sales pitch" as deceptive and as "scare tactics" in pointing out the limitations of reliance on social security, the lower interest rate earned on certificates of deposit, and the tax advantages of annuities, but the prosecutor did not allege that defendant made any factual misstatements concerning the terms of the annuity. More importantly, defendant was not charged with having made any false statements or fraudulent omissions and the jury was not instructed to find, and did not find, that he had made any such false statements.

"[E]ven if there was evidence in the record to support these elements, the jury was never called upon to determine if they had been established beyond a reasonable doubt." (*Ibid*.)

Moreover, there is another reason for which defendant's conviction cannot stand. Larceny requires an *intent* on the part of the perpetrator to steal — to deprive the owner of her property permanently or, under *People v. Avery* (2002) 27 Cal.4th 49, 55, "for so extended a period as to deprive the owner of a major portion of its value or enjoyment." "The taking required in larceny . . . must be 'felonious.' . . . [¶] . . . [¶] . . . ' " 'Felonious taking' means a taking with intent to commit the crime of larceny." ' " (*People v. Williams, supra,* 57 Cal.4th at p. 786.) The element of intent is stated clearly in CALCRIM No. 1800, from which the instructions in this case were taken. The third element of the offense as stated in CALCRIM No. 1800 is that "[w]hen the defendant took the property (he/she) *intended* (to deprive the owner of it permanently/ [or] *to remove it* from the owner's [or owner's agent's] possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property)." (Italics added.) However, as the instruction was given in this case, the third element inexplicably was changed to read: "when the defendant took the property he intended to deprive the owner of it permanently or *removed it* from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property." Rather than requiring the prosecution to prove that defendant "intended . . . to remove" the property from the owner's possession for an extended period of time that deprived the owner of a major portion of its value or enjoyment, as *People v. Avery, supra,* 27 Cal.4th at p. 55 and the CALCRIM instruction require, the prosecution here needed to prove only that the property was removed from the owner's possession for such a period, regardless of the defendant's intent. The jury was thus authorized to find defendant guilty if it agreed with the prosecution that the terms of the annuity had the effect of depriving Schuber of a major portion of the value or enjoyment of her property, even if defendant had no such

12

intention. [14] Indeed, in the prosecutor's final argument she told the jury, "[defendant] doesn't need to know that this product is necessarily not good for [Schuber], . . . it's really the fact that she couldn't understand." The elimination of the intent requirement unquestionably misstated the law in an essential respect.

There can be no doubt that this error was prejudicial. The omission of an essential element of an offense from the court's instructions is an error of constitutional significance since the defendant is entitled to a jury's finding that all elements have been proved beyond a reasonable doubt. (*People v. Stewart, supra,* 16 Cal.3d at p. 141; *People v. Hamilton, supra,* 80 Cal.App.3d at p. 133.) Moreover, had the jury been properly instructed, the outcome likely would have been different. The jury apparently was convinced that, at her age, it was not in Schuber's best interest to purchase an annuity that limited her access to more than 10 percent of the principal for five years. But there is no reason to believe that defendant did not in good faith believe otherwise and had no intention of depriving Schuber of anything, much less of a portion of the major value of her funds. Theft is a specific intent crime requiring the *intent* to steal. By permitting the jury to find defendant guilty if it found that the annuity deprived Schuber of a significant portion of the value or enjoyment of the funds with which she purchased it, regardless of whether the defendant considered the annuity to increase the value of her holdings and had no intention to deprive her of anything, the court prejudicially erred. Indeed, it is doubtful whether one who gives equal value in exchange for property received can ever be found to have intended to steal the property received.

Defendant's conviction must be reversed.

---

[14] Although defendant apparently failed to object to this modification, he retains the right to challenge the instruction on appeal because, whether or not there was an objection, it was the court's duty to properly instruct on all of the elements of the offense charged. (*People v. Stewart* (1976) 16 Cal.3d 133, 140; *People v. Hamilton* (1978) 80 Cal.App.3d 124, 133.)

## Disposition

The judgment is reversed.

_____
Pollak, J.

We concur:

_____
McGuiness, P. J.

_____
Jenkins, J.

14

Trial Court:                                    Lake County Superior Court


Trial Judge:                                    Hon. Richard C. Martin


Counsel for Defendant and Appellant:            John Doyle
                                                    Law Ofc of John Doyle

                                                Beong-Soo Kim,
                                                    and
                                                Joseph D. Axelrad
                                                    of Jones Day

Counsel for Society of Financial
Service Professionals
    as Amicus Curiae on behalf of
    Defendant and Appellant:                    Andrea Ambrose Lobato
                                                    and
                                                Jason R. Litt
                                                    of Horvitz & Levy

Counsel for Plaintiff and Respondent:           Sharon Wooden
                                                    Deputy Attorney General

                                                Kamala D. Harris
                                                    Attorney General of California
                                                Dane R. Gillette
                                                    Chief Assistant Attorney General
                                                Gerald A. Engler
                                                    Senior Assistant Attorney General
                                                Seth K. Shalit
                                                    Supervising Deputy Attorney General

1