Filed 9/21/22  P. v. Elsmore CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICHARD SCOTT ELSMORE,<br><br>    Defendant and Appellant. | E075090<br><br>(Super. Ct. No. RIF1703953)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br>[NO CHANGE IN JUDGMENT] |

The petition for rehearing is denied.  The opinion filed in this matter on September 14, 2022, is modified as follows:

On page 15, the references to CALCRIM 1.23 are modified to read CALJIC 1.23.

Except for this modification, the opinion remains unchanged.  This modification does not effect a change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
                                                            J.

We concur:

RAMIREZ
                        P. J.


McKINSTER
                    J.

Filed 9/14/22  P. v. Elsmore CA4/2 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>RICHARD SCOTT ELSMORE,<br><br>  Defendant and Appellant. | E075090<br><br>(Super. Ct. No. RIF1703953)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Samuel Diaz, Jr. Judge. Affirmed with directions.

Jeanine G. Strong, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Amanda Lloyd and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

1

I.

INTRODUCTION

Defendant and appellant Richard Scott Elsmore was sentenced to three years in prison after a jury convicted him of various offenses related to his financial abuse of Tina L., an adult with significant cognitive impairment and mental health issues. He argues his convictions must be reversed because there was insufficient evidence that Tina was a "dependent adult" under Penal Code section 368[1] and the trial court improperly instructed the jury with CALJIC No. 1.23. He also contends the abstract of judgment must be amended to correct clerical errors. We direct the trial court to amend the abstract of judgment but otherwise affirm the judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

Tina was born in 1989. She suffers from schizophrenia, bipolar disorder, and depression.

In 2013, when Tina was 22 years old, her parents died. They bequeathed Tina their paid-off house in San Jacinto, an annuity of $100,000, and a car.

After her parents' death, Tina asked someone to move in with her to help with her everyday needs. That person contacted Tina's estranged sister, who instead had Tina admitted to a psychiatric hospital twice in 2013.

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

2

Tina's ability to take care of herself continued to deteriorate after her hospitalizations. The person Tina invited to live with her invited squatters into the house, who stole about $40,000 from her.

In April 2013, a Sheriff's deputy responded to Tina's house in response to a neighbor's 911 call. Tina's mood quickly changed from crying to screaming to laughing. The deputy found Tina's living conditions to be "completely unfit." Her house was filthy, there were rotten piles of food around the house, and all of the food in her freezer was thawed or melted because the freezer door was left open.

Tina told the deputy that she wanted to kill unidentified people who had made her life difficult. She said she was upset that the government would not listen to her because she knew where Osama Bin Laden was hiding (even though he had been killed two years prior). The deputy placed Tina on an involuntary hold under Welfare and Institutions Code section 5150, during which she suffered from psychosis, mood swings, disorganized thought, and suicidal ideation.

Tina was released on May 1, 2013, but she was involuntarily hospitalized about a month later when she was found walking around her neighborhood naked and eating dirt. The hospital recommended that Tina be placed in an assisted living facility because she could not take care of herself. She needed help with everyday things, including, cooking, dressing, grooming, and managing her finances.

3

At some time in the spring of 2013, Tina met defendant when he was working on a house near hers. At Tina's request, defendant helped her jump-start her car. Defendant noticed that Tina's yard needed work, so he gave her his card and told her to call him if she needed help with anything.

Tina later called defendant when she needed a ride because her car was being impounded and she was driving on a suspended license. Defendant picked her up and drove her home. While on the way, Tina told defendant that she suffered from bipolar disorder and schizophrenia.

Tina began asking defendant for rides when he was working on nearby houses. Tina became a "big project" for defendant. She needed help collecting rent from a tenant in her house and told defendant that she thought squatters had stolen $40,000 from her mother's life insurance.

Defendant learned that Tina had an annuity and offered to help her manage her finances. He told Tina that he could double or triple her money. Tina trusted defendant, so she accepted his offer.

On May 8, 2013, shortly after being released from the hospital, Tina signed a contract that defendant drafted. Its stated purpose was to provide Tina a "stable and beneficial foundation to deal with and address her personal, spiritual, financial, mental, and all other temporal needs." Tina understood the contract as providing that defendant would manage her finances for her benefit and that she would receive all of the money he made.

4

The agreement stated, among other things, that Tina had been "'5150'[d]'" from her home on a "number of occasions" and that she could not maintain her house "due to challenges arising from mental illness, stress, neighbors stealing from her, and her feelings over her parents passing." The agreement provided that defendant would assume the responsibility of ensuring that "Tina is taken care of, that she has a place to live, has food to eat, has clothing, entertainment and other activities that support a meaningful existence." Under the agreement, defendant was authorized to draw upon any of Tina's financial resources so as to "support all the needs of Tina." The agreement thus provided that defendant "shall handle any and all of [Tina's] finances" and that she gave defendant "full discretion and full faith to handle her expenses and finances" and allowed him "to go forward and manage her finances in a manner that he sees fit."

Another portion of the agreement dealt with Tina's mental health needs. It stated: "Since Tina has been dealing with mental illness for most of her life, there may arise the need to be medicated, seek mental health needs, provide medications, provide help and promote the overall needs of having stability in her life. [Defendant] agrees to assist Tina in seeking such things. If the needs arise, [defendant] will provide whatever Tina needs to remedy her mental health situation. This includes, but is not limited to: visits to the mental health clinis [sic], visits to counseling, support, medications, and providing for the general welfare of Tina."

About six months later, Tina and defendant executed an addendum to the agreement, which provided that defendant would be "the sole person" responsible for

5

Tina's house.  The addendum also provided that defendant had "sole discretion" to decide how to use money generated by the property, and that he would receive reimbursement for "managerial costs" and "whatever expenses he sees fit."

Tina trusted defendant with her finances, but he never explained to her how much he or she would get from any profits.  Tina was afraid to ask because she did not want to get into an argument with defendant.  Defendant would become angry and defensive when she asked him about her finances.

Tina never received any money that defendant promised.  At some point after they executed the agreement, defendant took control of Tina's debit card and told her that she was not allowed to make any purchases without his permission.

Between her hospitalizations in 2013, Tina moved into defendant's house where he and his wife, Merrily, took care of her full time.  While living with defendant, Tina was not allowed to cook because she had almost set her house on fire while cooking.

After Tina and defendant executed the addendum, defendant and Merrily's friend, Stacey Ten-Napel, began renting out Tina's house for $1,500 per month.  Because the house was filthy and in serious disarray, it took Ten-Napel weeks to clean it and repair everything.  Ten-Napel always paid rent in cash, and usually gave it to defendant or his wife, but she gave it to Tina a few times.  Tina believed defendant was saving the rent money for her, but did not question him about it because she was scared of upsetting him.

In the summer of 2013, Tina began working with defendant at Curry Copy. She frequently complained to a coworker that she was hungry.

In January 2014, defendant helped Tina apply for Social Security benefits. Defendant asked Tina questions to fill out the first form, but he filled out the second form himself and signed it. The forms provided the following information about Tina: "The side effects of [Tina's] medication make her slower and tired and hinder her ability to work"; her mental health issues affect her memory, concentration, understanding and her ability to following instructions and complete tasks; she cannot pay bills, count change, or handle a savings account; she needs reminders to bathe; she needs reminders to go places and needs to be accompanied; she cannot prepare food without supervision; "Since her parents were her primary source of care and they both died, she was left to her own care and was unable to do so. We [defendant and Merrily] have taken care of her since."

Tina moved out of defendant's house and into a mobile home in late 2014. Tina paid for the mobile home with her annuity, but defendant's name was on the title. Defendant was also on the mobile home's lease because she had poor credit and would not have qualified for it without defendant.

After Tina moved in, the mobile home became filthy and started smelling bad. Tina had no food in her mobile home and was not allowed to keep food in the refrigerator. Instead, Merrily would give Tina expired food or the family's leftovers.

Because Tina's mobile home was not close to anything, she relied on defendant and Merrily to drive her. On several occasions, Tina missed appointments and could not pay for her medications because she had no insurance or money. Defendant eventually helped Tina sell her car because she had no money and could no longer drive. Tina, however, did not receive any of the proceeds from the sale.

Defendant also used Tina's money to buy a dune buggy and two Porsches, but did not place the vehicles in Tina's name. To buy one of the Porsches, defendant had Tina tell her bank that she wanted to withdraw money to make home improvements. Defendant told Tina that he would flip the vehicles and make a profit, but defendant never sold them.

On another occasion, Tina called her bank at defendant's request and asked to transfer $10,000 into her account. Defendant used the money to buy a minivan for Merrily.

On several other occasions, defendant took Tina to her bank, directed her to withdraw money, and then kept the money for himself. Defendant also had online access to Tina's bank accounts. Eventually, defendant convinced Tina to surrender her annuity, purportedly to pay property taxes. Defendant also had an attorney draft a will for Tina, which left all of her property to defendant.

At some point, defendant used $28,000 of Tina's money to buy a parcel of land, which he put in Merrily's name. Defendant frequently made Tina help cut wood and clear the property.

Tina complied with all of defendant's demands because she was afraid of him or Merrily blackmailing her. Tina had traffic warrants out for her arrest, and Merrily threatened to call the police and have Tina arrested if she did not do as she was told.

In February 2016, Tina was hospitalized for a few days because of suicidal ideation. At the time, she had $4 in her bank account. While she was in the hospital, members of Tina's church went to clean her mobile home. They discovered it was filthy, had no food, the water in the bathroom did not work, and there was a hole in the floor.

When Tina returned home, Therese and Chuck Steadman, defendant's employers, visited Tina at her mobile home. They later called Adult Protective Services and took her to live with them.

Adult Protective Services referred Tina to a neurologist, who examined her in March 2016. The neurologist concluded that Tina had serious mental health issues, including schizophrenia and possibly schizoaffective disorder. Although the neurologist did not think Tina should be placed in involuntary conservatorship, he recommended financial oversight for her because she needed help managing her finances.

A couple of years later, Therese helped Tina buy a condo in her name. Tina lived in the condo for a few months with another church member. Tina, however, could not care for herself properly and ended up moving in with Bonnie Rice.

While living together, Rice learned that Tina could not take care of herself. Tina could not handle her own money, could not pay bills online, and did not know how to

9

cook. She also needed reminders to bathe, wash her hair, take her medication, and go to her appointments.

A forensic analysis revealed that defendant and Merrily had depleted Tina's accounts. Tina's entire $100,000 annuity had been withdrawn, which caused her to incur penalties of over $18,000. Defendant used the funds to purchase the Porsches, the parcel of land, and the minivan. Although the rent from her property totaled over $45,000 over the years, Tina received only $10,277.

In the 18 months before meeting Tina, Merrily deposited $1,300 into her account. After defendant and Tina entered into their agreement, however, Merrily deposited over $41,000 into her account.

Defendant was charged and convicted of two counts of financial abuse of a dependent adult by a caretaker (§ 368, subd. (e); counts 1 & 2). The jury also found true that in committing count 1 defendant took property exceeding $65,000 (§ 12022.6, subd. (a)), and that he committed two or more related felonies involving the taking of more than $100,000 (§ 186.11). The trial court sentenced defendant to three years in prison.

## III.

## DISCUSSION

A. *Tina Was a Dependent Adult under Section 368*

Defendant argues substantial evidence does not support the jury's finding that Tina was a dependent adult under section 368 and thus his convictions must be reversed. We disagree.

10

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

Section 368, subdivision (e) criminalizes the financial abuse of "a dependent adult" by a caretaker. (See *People v. Heitzman* (1994) 9 Cal.4th 189, 250.) When defendant committed his offenses, section 368, subdivision (h) defined "dependent adult" as "any person who is between the ages of 18 and 64, who has physical or mental limitations which restrict his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, persons who have physical or developmental disabilities or whose physical or mental abilities have diminished because of age."

Defendant argues Tina was not a "dependent adult." In his view, dependent adults are individuals "whose disabilities and needs are comparable to persons who are compelled to live in nursing homes and other health care facilities." We disagree.

11

*People v. Matye* (2008) 158 Cal.App.4th 921 (*Matye*) is the only published case to interpret "dependent adult" under section 368. Rejecting the defendant's argument that a dependent adult is someone who is "*incapable* of carrying out normal activities," the *Matye* court concluded that a dependent adult is any individual whose ability to carry out normal activities "is limited in some significant way" due to the individual's physical or mental limitations. (*Matye*, *supra*, at pp. 923, 925, italics added.) The court reasoned that "'[r]estrict,'" as used in section 368, is "not synonymous with 'preclude,'" and that a "restriction is only a limitation or restraint." (*Matye*, *supra*, at p. 925.)

Defendant argues *Matye* was wrongly decided and urges us to follow three cases that he claims interpreted section 368 differently. Two of the cases, *Estate of Odian* (2006) 145 Cal.App.4th 152, and *Estate of Shinkle* (2002) 97 Cal.App.4th 990, disapproved on other grounds by *Bernard v. Foley* (2006) 39 Cal.4th 794, 816, footnote 14, involved individuals who were indisputably dependent adults, so they do not provide any guidance here. (*Estate of Odian*, *supra*, at p. 163; *Estate of Shinkle*, *supra*, at p. 1005.) We decline to follow the third case, *Cabral v. County of Glenn* (E.D. Cal. 2009) 624 F.Supp.2d 1184, 1194, a federal district court case, because it is not binding on us, did not discuss *Matye*, and relied entirely on an unpublished Court of Appeal opinion. Moreover, the district court there only granted a motion to dismiss because the plaintiff's "conclusory assertion" that he was a dependent adult was insufficient to support a finding that he was a dependent adult. (*Id.* at pp. 1194-1195.)

12

In any event, we find *Matye* persuasive and follow it here. We therefore must uphold the jury's finding that Tina was a "dependent adult" under section 368 so long as there is substantial evidence in the record that her mental health issues significantly restricted her ability to carry out normal activities. (See *Matya*, *supra*, 158 Cal.App.4th at p. 925; *People v. Johnson* (1980) 26 Cal.3d 557, 578; *People v. Marshall* (1997) 15 Cal.4th 1, 34)

There is overwhelming evidence in the record that Tina was significantly restricted in carrying out normal, everyday activities. To begin with, defendant and Tina entered into their agreement because defendant knew Tina could not properly manage her finances due to her mental health issues. According to the Social Security applications that defendant filled out for Tina, she was incapable of caring for herself and her finances.

Tina's house was filthy and "completely unfit" to live in, and her mobile home was no better when the Steadmans discovered its condition. At all relevant times, Tina could not cook for herself and needed reminders to bathe, take her medication, and go to her medical appointments. According to several people who know Tina, as well as the neurologist who examined her, she was not capable of adequately caring for herself or her finances. The neurologist therefore recommended financial oversight for Tina.

This undisputed evidence provided more than enough for the jury to properly find that Tina was a dependent adult under section 368. Substantial evidence thus supports defendant's convictions.[2]

B. *The Trial Court Properly Instructed the Jury With CALJIC No. 1.23*

To prove that defendant was guilty of theft of property from a dependent adult in violation of section 368, the prosecution had to prove that defendant committed the theft either by larceny or embezzlement. CALCRIM No. 1800 provided that the prosecution had to prove that defendant took Tina's property without her consent, but the instruction does not define "consent." The prosecution thus asked the trial court to instruct the jury with the definition of consent in CALJIC No. 1.23. Defendant's counsel objected on the ground that giving CALJIC No. 1.23 would be "confusing" because the definition of consent was not provided in the CALCRIM instructions.

The trial court overruled the objection and instructed the jury with CALJIC No. 1.23, which defined consent as follows: "To consent to an act or transaction, a person (1) must act freely and voluntarily and not under the influence of threats, force or duress; (2) must have knowledge of the true nature of the act or transaction involved; and (3) must possess the mental capacity to make an intelligent choice whether or not to do something proposed by another person. [¶] Merely being passive does not amount to consent. Consent requires a free will and positive cooperation in act or attitude."

_____

[2] The People's March 29, 2021 request for judicial notice of a portion of section 368's legislative history is denied as unnecessary to resolve the issues on appeal.

14

Defendant argues the trial court erred by giving the instruction for three reasons: (1) it does not accurately define "consent" in the context of theft; (2) it failed to inform the jury that the prosecution had the burden of proving lack of consent; and (3) it likely confused the jury.

As for defendant's first two arguments, we agree with the People that defendant forfeited them by failing to object on the grounds he now advances for the first time on appeal. CALCRIM No. 1.23 accurately states the law of consent as it relates to theft. (See *People v. Catley* (2007) 148 Cal.App.4th 500, 505 [holding CALJIC No. 1.23 "properly instructed [jury] on the issue of consent" in case involving victim incapable of consenting to financial transaction because of cognitive impairment and memory loss].) Defendant disagrees, citing *People v. Brock* (2006) 143 Cal.App.4th 1266, which he claims held that CALCRIM No. 1.23 inaccurately stated the law of consent in the theft context. The *Brock* court did not do so, but instead held that the trial court erroneously "supplemented" CALCRIM No. 1.23 by giving the jury an instruction about undue influence that the trial court did not give to defendant's jury.

Because CALCRIM No. 1.23 properly instructed the jury on consent, defendant's arguments raised for the first time on appeal challenging the instruction are subject to forfeiture. In *People v. Lee* (2011) 51 Cal.4th 620 (*Lee*), our Supreme Court observed that "[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of

15

appeal [citations]." (*Id.* at p. 638.) Like defendant here, the defendant in *Lee* argued that CALJIC No. 1.23.1, which defines consent in sex offense cases, "improperly reduced the prosecution's burden of proof." (*Lee*, *supra*, at p. 638.) The *Lee* defendant forfeited the argument by failing to raise it in the trial court. (*Ibid.*)

Like the challenged instruction in *Lee*, CALJIC No. 1.23 "correctly expressed the law," so if defendant "believed the instruction on consent required elaboration or clarification, he was obliged to request such elaboration or clarification in the trial court." (*Lee*, *supra*, 51 Cal.4th at p. 638; *People v. Catley*, *supra*, 148 Cal.App.4th at p. 505.) By failing to do so, defendant forfeited his first two challenges to CALJIC No. 1.23. (*Lee*, *supra*, at p. 638.)

We therefore reject defendant's argument that we should consider his forfeited arguments under section 1259. We also reject defendant's argument that he did not forfeit his first two challenges to CALJIC No. 1.23 because he objected to the instruction "in its entirety." (See *People v. Farnam* (2002) 28 Cal.4th 107, 165 [objection at trial to instruction on one ground in trial court but not on second ground raised on appeal forfeited appellate review of second argument].) In any event, we reject defendant's first two challenges to CALJIC No. 1.23 on the merits.

As for defendant's first argument, CALJIC No. 1.23 properly defined consent under the circumstances of this case. (See *People v. Catley*, *supra*, 148 Cal.App.4th at p. 505.)

16

As for defendant's second challenge, "[w]e must consider the instructions together as a whole, to determine whether it is reasonably likely a jury would interpret an instruction in a particular way, because we presume jurors understand and correlate all of the instructions." (*People v. Burton* (2018) 29 Cal.App.5th 917, 925.) Although CALJIC No. 1.23 did not speak to the prosecution's burden, other instructions did. CALCRIM Nos. 1800 and 301 told the jury that the prosecution had to prove every element beyond a reasonable doubt, including the lack of consent. The fact that CALJIC No. 1.23 did not do so does not mean that the instruction was erroneous.

Relying on *Lee*, *supra*, 51 Cal.4th at page 641, defendant contends the "general instructions on burden of proof and reasonable doubt" (CALCRIM Nos. 1800 and 301) were inadequate to instruct the jury that the prosecution had to prove lack of consent beyond a reasonable doubt. *Lee*, *supra*, 51 Cal.4th 641 does not help defendant. There, our Supreme Court held in relevant part that CALJIC No. 1.23.1 (not CALJIC No. 1.23) does not impermissibly create a mandatory presumption that an alleged rape victim has not consented to sex unless she expressly communicated her consent and does not relieve the prosecution from proving lack of consent when the victim is passive. (*Lee*, *supra*, at p. 641.) Our Supreme Court thus did not consider whether "general instructions" sufficiently instructed the jury on the prosecution's burden of proving lack of consent beyond a reasonable doubt.

17

As for his third challenge, we reject defendant's argument that CALJIC No. 1.23 likely confused the jury. Defendant contends the instruction's definition of consent conflicts with the "commonsense meaning of the term" and the "plain meaning of consent." In defendant's view, CALJIC No. 1.23 suggests that consent cannot be passive and must involve "'positive cooperation,'" whereas the common understanding of consent may include passive behavior.

Even if defendant is correct, the trial court instructed the jury that "some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. Please be sure to listen carefully and follow the definitions that I give you." We presume jurors follow the instructions they are given. (*People v. Lopez* (2020) 46 Cal.App.5th 505, 525.) Defendant provides no meaningful argument why the jury could not use only the definition of consent in CALJIC No. 1.23 as instructed. We therefore conclude the trial court did not err by giving CALJIC No. 1.23.

Even if the court did err, the error was harmless under any standard. The evidence that defendant stole or embezzled money from Tina was overwhelming. Under defendant's agreement with Tina, he could use her resources solely for her benefit and for her needs. He was not allowed use Tina's money to buy motor vehicles in his name or land in his wife's name with no apparent benefit to Tina. Under any definition of consent, Tina did not consent to defendant's spending more than $100,000 of her money on himself.

18

C. *Good Faith Defense*

Without any meaningful explanation, defendant contends the trial court's failure to properly instruct the jury on consent and the prosecution's burden of proving lack of consent also prevented the jury from "fully and fairly evaluating" his good faith defense. We disagree.

The issue of consent concerned only whether Tina consented to defendant's use of her property. As defendant correctly observes, he could not be liable for theft or embezzlement if he had a good faith belief that he was entitled to take and use Tina's property as he did. (See *People v. Selivanov* (2016) 5 Cal.App.5th 726, 768; *People v. Romo* (1990) 220 Cal.App.3d 514, 517 ["'It is an established principle of the law of theft that a bona fide belief of a right or claim to the property taken, even if mistaken, negates the element of felonious intent.'"].) This is true irrespective of whether Tina consented. (See *People v. Selivanov*, *supra*, at p. 768; see also § 511 [good faith belief to title of property is complete defense to embezzlement], § 490a ["Wherever any law or statute of this state refers to or mentions larceny, embezzlement, or stealing, said law or statute shall hereafter be read and interpreted as if the word 'theft' were substituted therefor."].)

As CALCRIM No. 1806 (theft by embezzlement) correctly told the jury, whether defendant had a good faith defense had nothing to do with Tina's consent, but instead turned entirely on defendant's understanding of their agreement. The definition of consent thus had no bearing on defendant's good faith defense. As a result, the error in CALJIC No. 1.23's definition of consent, if any, did not impede defendant from

19

advancing that defense and did not preclude the jury from "fully and fairly" considering it.

D. *The Abstract of Judgment Must Be Corrected*

Defendant contends the abstract of judgment incorrectly states that defendant was convicted as a result of a plea deal and that his offenses occurred in 2012. He also argues that the abstract incorrectly states he was ordered to pay a $80 court operations assessment ($40 per count) under section 1465.8, subdivision (a)(1), and a $60 criminal conviction assessment ($30 per count) under Government Code section 70373.

The People agree, as do we, that the abstract of judgment should be amended to reflect that defendant was convicted after a jury trial and his offenses occurred between 2013 and 2015. We therefore direct the trial court to amend the abstract of judgment accordingly.

As for the assessments, defendant is incorrect. When announcing its sentence, the trial court stated that it would impose "court fees of $70" for each count. The abstract of judgment thus accurately reflects the $40 and $30 assessments imposed for each count.[3]

---

[3] Defendant's January 29, 2021 request for judicial notice of his counsel's letter to the trial court concerning alleged errors in the abstract of judgment is granted.

IV.

DISPOSITION

The judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment reflecting that defendant was convicted after a jury trial and that his offenses occurred between 2013 and 2015, and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON_____<br>J.

We concur:

RAMIREZ_____<br>
        P. J.

McKINSTER_____<br>
        J.

21